4p 141
106  445

KENNEDY and MORELAND VS THE HEIRS OF M'CARTNEY.

4p 141
180  255

*Points upon the construction of the treaty of 1817, be-*
*tween the United States and Cherokee Indians.*

*As to estates granted by Government upon a contingen-*
*cy—how revested.*

*As to title acquired by one, (having none before,) after*
*conveyance.*

*As to evidence in trespass to try titles.*

1. The reservation of lands to the Cherokee Indians, under the
8th article of the treaty of 1817, enures, as a life estate to
the reservee, only upon compliance with the condition of con-
tinuance thereon, as stipulated; and this failing, the fee sim-
ple in the land reserved, reverts immediately to the United
States.

2. This condition of continuance upon the reservation, during
the life-time of the reservee, is one annexed to the life-estate;
and upon the breach of it, the expectant estate of the reser-
vee's wife and children, is at once destroyed.

3. That a reservee has complied with the requisites of the trea-
ty, in making his selection—registering his name, &c. may
be proved by the deposition, regularly taken, of the Chero-
kee agent.

4. A reservee of lands, under this treaty, can not make any
disposition by lease, stipulating a continuance beyond the pe-
riod of a removal from the land, or the extent of his life.

5. Though it seems a lease might be effected of a *portion* of
the land, for a time not beyond these periods, if possession is
retained of the residue.

6. Estates granted by government, subject to forfeiture, upon a
future condition—in the event of their forfeiture, no entry or
other act is necessary, in order to divest the estate out of the
grantee.

7. Where one, having no title to real estate, conveys it, with

warranty of title, a title, acquired after the grant, will pass to, and vest instantly in the grantee.

8. The act of Congress of the 29th May, 1830, which relinquished to Conaleskee, a Cherokee Indian, and his heirs, all the right of reversion of the United States in and to a certain tract of land, contemplated an immediate sale of the same by him; and not a mere possession, for the benefit of a previous purchaser.

9. It seems, that in trespass to try titles, the record of a previous suit between the ancestor of the plaintiff, and the defendant, for the same premises—might be good evidence, to show notice to the latter of a paramount title, in order to fix a period from which the plaintiff is entitled to recover damages for the occupancy of the premises.

This was an action of trespass to try titles, in the Circuit Court of Madison; and was prosecuted by the next friend of the heirs of James M'Cartney, against William M. Kennedy and Elisha Moreland, for the recovery of a tract of land, known and described as the reservation of Conaleskee, or Challenge, a Cherokee Indian.

The defendant, Kennedy, plead—first, not guilty; second, a special plea, controverting the title of the plaintiffs in the land in question, and setting out a title in fee simple, from Conaleskee to him, of date the first of April, eighteen hundred and twenty-nine, and alleged to have been duly acknowledged and recorded.—Thirdly, a special plea, relying upon the same title. And there were oyer and demurrer to the second and third pleas; which demurrer was sustained: and, subsequently, verdict and judgment rendered in favor of the plaintiffs.

By a bill of exceptions taken to the opinion of the Court, the following facts appeared to have transpired on the trial.

The plaintiffs introduced and read to the jury,

First—the treaty between the United States and the Cherokee nation of Indians, entered into on the eighth of July, eighteen hundred and seventeen.

Secondly—an act of congress, approved the twenty-ninth May, eighteen hundred and thirty, relinquishing to Conaleskee all right of reversion of the United States, in and to a reservation of his, under the treaty.

Thirdly—a deed of conveyance in fee simple, from Conaleskee, alias Challenge, to John M'Anulty, of the lands in controversy, dated the seventeenth day of June, eighteen hundred and thirty.

Fourthly—a deed of conveyance, executed on the twenty-sixth of August, eighteen hundred and thirty, of the same premises, from John M'Anulty and wife, to James M'Cartney, the ancestor of the plaintiffs—all regularly acknowledged and registered.

The plaintiffs proved by a witness, that Conaleskee, after the date of his deed to M'Anulty, and prior to the date of M'Anulty's deed to the plaintiffs' ancestor, left this State, and went to his tribe, beyond the Mississippi—out of the limits of the United States, and any territory thereof. They also proved, that the defendants were in possession of the premises; and the value of the rents thereof. Also, that from the year eighteen hundred and twenty-five up to the time of his leaving the State, Conaleskee had not resided upon the lands in controversy: and that the lands claimed were parts of the reservation made by him under the treaty.

The plaintiffs further introduced and read to the jury, after objection from the defendants, but which

the Court overruled—first, the copy of a commission from the President of the United States, to Robert Houston, to lay off the reservations made by the Cherokees, under the treaty; together with copies of sundry letters of John C. Calhoun, Secretary of War, specifying his duty—all regularly certified, as taken from the records of the war department.

Secondly—A copy of the platt of the land in controversy, taken from the books of the general land office—also, regularly certified.·

Thirdly—The deposition, regularly taken, of Hugh Montgomery, agent of the Cherokee nation East of the Mississippi, showing the entry by Conaleskee of the reservation made by him, under the treaty; a survey of the same; and a platt and certificate.

Fourthly—The record of a suit commenced by the plaintiffs' ancestor, against the defendants, in his life-time, for the recovery of the lands in question, but abated by his death; and which was offered as evidence of a demand of the possession.

The defendants offered evidence, on their part, to show, that at the time of making the treaty of eighteen hundred and seventeen, and at the time of the registration of his name in the office of the agent, Conaleskee did not reside within the territory ceded; and that he was not the head of an Indian family; and had no improvements upon the land at that time. Also, that Conaleskee said, when he left the country, "that he did not go with a view of remaining permanently, but of returning soon again:" that, when going, he cried—because, as he said, "that M'Anulty and M'Cartney threatened to shoot him, if he did not go." Defendants also offered to prove

that Conaleskee employed one, to build a mill upon a reservation made by him, upon Flint River; that he afterwards abandoned that reservation, and without any other entry, than that which was proven in' the deposition of Montgomery, took possession of the land now in controversy, and procured its survey.

To the introduction of all this proof, the plaintiffs objected, and the objection was sustained and the testimony excluded.

The defendants then read to the jury a conveyance in fee simple, from Conaleskee to Kennedy, of the premises in question, dated the first April, eighteen hundred and twenty-nine. A lease for thirty years from Conaleskee to one Eason, executed about the year eighteen hundred and twenty-four, of part of his said reservation, was also produced in evidence, containing an assignment by indorsement of the same from Eason, to Kennedy.

It was also proved, that from the year eighteen hundred and twenty-five, up to the time of leaving this State, Conaleskee lived with and boarded with Kennedy; and that said lease included all the land in the possession of the defendants, at the time of the commencement of this suit.

The defendants, upon this testimony, requested the Court to charge the jury—

First—That unless the plaintiff had proved that the land sued for, lay within the boundary of the territory ceded by the treaty of eighteen hundred and seventeen, they could not recover in this action.— This instruction the Court qualified, by saying, that the treaty, the act of congress, of eighteen hundred

4P     19

and twenty, and the platt, were competent proof of that fact.

Secondly—That the eighth article of said treaty vested in Conaleskee, a fee simple title to the land : and his deed to said Kennedy was good.

This instruction the Court refused.

Thirdly—That the said eighth article of said treaty, restraining Conaleskee from removing from said land, created a condition, and not a limitation; and, being a condition, its breach did not avoid the estate thereby granted, but only rendered it voidable ; and being voidable, only, the grantor, (that is, the United States,) alone, had a right of re-entry, for breach of such condition ; and, unless the grantor did enter, none other could ; and, until the grantor did enter, the grantee's estate in the land was good.

This charge the Court also refused, but informed the jury, that if they believed Conaleskee removed from the land, such removal was a forfeiture of his estate, and therefore, his estate in the same, ceased.

Fourthly—That although the jury should believe this to be a condition, and Conaleskee's sale to Kennedy a breach of it—yet this sale passed his whole interest to Kennedy, whose estate, thus derived under such sale was good, and could not be defeated or made void by Conaleskee, or those claiming under him ; but only by the United States, the grantor.---- This the Court also refused, but with the qualification above.

Fifthly----That although the jury should believe the title derived by Kennedy, under the deed from Conaleskee to him, should be absolutely void----yet, that the *warranty* in said deed estopped Conaleskee,

and all persons holding under him, from claiming in opposition to said deed.   This the Court refused.

Sixthly----That, if the jury believed the clause restraining removal, was a *condition*, then the condition was annexed to the life estate, and not to the remainder or reversion in fee; and, being annexed to the life estate, void, because it would go to defeat the estate in part, and not in whole.

This was also refused.

Seventhly----That if the jury believed the United States intended to convey a reversion in fee, to the children of the tenant for life, then the reversion was not contingent----depending upon the contingency of Conaleskee's remaining upon the land.

This the Court likewise refused.

Eighthtly—That if the jury believed, at the passage of the act of Congress, Conaleskee had no estate in possession in said land, he never having acquired one before; or his previous estate therein being forfeited and void—then said act of Congress did not vest in Conaleskee the reversion of the United States, nor any estate whatever.

This the Court refused also.

Ninthly—Although the jury should believe the deed from Conaleskee to Kennedy, to be a violation of law, and of the treaty; yet, if the United States waived the wrong thereby inflicted, and afterwards released to Conaleskee their reversion,—then such release operated to vest said reversion in Kennedy; and if not in him, it vested in no person, but remained still in the United States.

This was refused.

Tenth—That though the jury should believe Co-

aleskee had forfeited his estate in said land, yet that his estate therein continued until the United States took some steps to ascertain such possession, and revest the estate in them; and that this could be only done by inquest of office.

This was refused.

Eleventh—That the United States, by the above named act of Congress, had acknowledged that, at its passage, Conalesskee's estate in said land was still good; and that his sale to Kennedy had not avoided it; or if it was forfeited, the United States relinquished all the right of enforcing their remedy against him, for it.

This was also refused.

Twelfth—That though the lease from Conaleskee to Eason, and assigned to Kennedy, was void, yet Kennedy having entered on the land, by the consent of Conaleskee, this constituted him tenant from year to year; and being such tenant, neither Conaleskee, nor those holding under him, could recover the land without first giving six months notice to quit, which six months should expire at the end of the year. This was also refused.

Thirteenth—That if the jury believed there had been an attempt made by Conaleskee, to sell said land to Kennedy, which sale had never taken effect, and been carried into execution,—then neither Conaleskee, nor those holding under him, could recover rent for the same.

This the Court refused—qualifying the same by charging that plaintiffs were entitled to recover rent from the time of their title and demand.

The Court also charged the jury, that if they be-

lieved Conaleskee had removed from the land, that by such removal he forfeited his estate, which thereby became absolutely void: and further, that said treaty did not convey any title by way of grant from the United States, but that Conaleskee held the land as a reservee under the treaty.

To all which the defendants excepted, and took their writ of error.

*Robinson*, for plaintiff in error.
*McClung* and *S. Parsons*, contra.

COLLIER, J.—The defendants in error, as the heirs at law of James M'Cartney, deceased, brought an action of trespass to try titles, in the Circuit Court of Madison, against the plaintiffs in error.

The defendants to make out their title, relied upon treaties of the eighth of July, eighteen hundred and seventeen, and the twenty-seventh of February, eighteen hundred and nineteen, between the United States and Cherokee tribe of Indians, which allowed reservations of six hundred and forty acres to the heads of families of that tribe, who desire to remain east of the Mississippi. The defendants in error also produced a sworn copy from the files and entries in the books of the office of the Cherokee agent, of a survey and platt of six hundred and forty-acres of land, allotted to Conaleskee, or Challenge, under the former treaty. They then gave in evidence an act of Congress of the twenty-ninth May, eighteen hundred and thirty, by which it is enacted, " That all right, title, and interest which might accrue or revert to the United States, to the reservation of land now

claimed and possessed by Conaleskee, commonly called Challenge, &c, under a treaty made and concluded between the United States and the Cherokee tribe of Indians, on the eighth day of July, in the year of our Lord, one thousand eight hundred and seventeen, &c., all lying in the State of Alabama, be and the same are hereby relinquished and vested in the said reservees, and their heirs respectively : *Provided,* that the said Conaleskee, commonly called Challenge, &c., with their respective families, shall remove to their respective tribes west of the Mississippi river, not included within any State or Territory: and that the government of the United States shall not be chargeable with the expense of their removal, or transportation, or with any allowance of land to, or on account of, either of them or their respective families : *And provided also,* that no conveyance or deed of the said lands, or any part of them, shall be valid or effectual, until every such conveyance or deed shall be submitted to one of the district attorneys for the district of Alabama, for his approbation : and if, after enquiry into the facts and circumstances attending the contracts for the sale of any of the said lands, he shall be satisfied that such contracts are fair, and that the consideration paid, or agreed to be paid therefor, is adequate, he shall endorse his approbation on each conveyance and deed so approved ; and thereafter the same be deemed valid and effectual."

The defendants in error then proved, that Conaleskee, or Challenge, had removed, with his family, west of the Mississippi river, as contemplated by the first *proviso* of the act. They also produced and

read to the jury, a deed dated the seventeenth June, eighteen hundred and thirty, approved in due form, by the attorney for the northern district of Alabama, and regularly proved and recorded, from Conaleskee, or Challenge, by which he conveyed in fee simple, the land in controversy, to John M'Anulty ; and also a deed from M'Anulty, and wife, properly acknowledged, by which the same land is conveyed to James M'Cartney, the ancestor.

The defendants in error gave in evidence, a lease from Conaleskee, or Challenge, to Abner Eason, dated the twenty-ninth day of June, eighteen hundred and twenty-four, of all the lands in question that is occupied by them, for the term of thirty years, which lease they proved to have been assigned to Kennedy about the year eighteen hundred and twenty-five.

The plaintiffs in error then gave in evidence, a conveyance in fee of the lands in question, with warranty of title, dated in May, eighteen hundred and twenty-nine, from Conaleskee, or Challenge, to William M. Kennedy. Conaleskee, or Challenge, ceased to occupy before the passage of the act of May, eighteen hundred and thirty.

The plaintiffs in error proposed to prove these further facts—

That when Conaleskee left the land, he said he did not intend to remain away, and that he cried, because, as he said, M'Anulty and M'Cartney threatened to shoot him if he did not go : that Conaleskee, at the date of the registration of his name, did not live on the ceded territory, and that he was not the head of a family, and had no improvement on the land ; which several propositions were refused by the Court.

Many instructions were asked of the Court, by the counsel for the plaintiffs in error, most of which were denied, and some given in qualified terms.

As the correctness of the judgment of the Court, so far as it depends upon these, must necessarily be examined in considering the title of the defendants in error, we will decline noticing them more particularly here.

The questions naturally arising in this case are—

First—What description of estate does the treaty of July, eighteen hundred and seventeen, propose to pass to the reservees under it?

Second—Has the plaintiff in error, William M. Kennedy, acquired any interest in the reservation, by the lease, of which he claims to be the assignee, or under the deed of the reservee.

Third—What influence has the act of May, eighteen hundred and thirty, upon the claim of Kennedy, and does it give validity to the title set up by the defendants in error.

1. By the treaty of July, eighteen hundred and seventeen, the Cherokee tribe of Indians cede to the United States, a portion of their territory, lying east of the Mississippi river. In its third article, it is stipulated, that a census shall be taken of the entire Cherokee nation, both east and west of the Mississippi, in the month of June, of the year eighteen hundred and eighteen, with a view to ascertain the number east of the Mississippi, and those who intend to remain there.

By the 8th article of that treaty, the United States agree to give to each head of a Cherokee family, residing east of the Mississippi, a reservation of six hun-

dred and forty acres in a square, to include their improvements, which are to be as near the centre thereof as practicable, " in which they will have a life estate, with a reversion in fee simple to their children, reserving to the widow her dower, whose names are to be registered in the office of the Cherokee agent, which shall be kept open until the census is taken, as stipulated in the third article : Provided, that if any of the heads of families, for whom reservations may be made, should remove therefrom, then, in that case, the right to revert to the United States."

In the treaty of eighteen hundred and nineteen, among other stipulations, it is agreed to dispense with the census, provided for by that of eighteen hundred and seventeen. And the United States agree to pay for all the improvements made upon the ceded territory, which enhance the value of the lands, and do agree to allow a reservation to the heads of Cherokee families, as previously stipulated.

In considering the character of the estate to which the reservees, under the treaty of eighteen hundred and seventeen, are entitled, we do not deem it necessary to examine the abstruse doctrine pertaining to estates tail, or the subtle and artificial distinctions, between conditions and limitations, which have been so elaborately discussed at the bar.

In the interpretation of deeds it is sometimes profitable to draw knowledge from this extensive source of law learning; but in the exposition of an instrument, having the form, and subject to the rules of construction which apply to treaties, it cannot be necessary to refer to the common law, unless it is apparent that the stipulations of the parties were made,

with a view to the control of that system of juris-
prudence. The treaty furnishes no such indication;
nor indeed could it, for the Cherokees must then have
been wholly ignorant of our municipal laws.

It is a cardinal maxim of interpretation, that it is
not permitted to interpret what has no need of inter-
pretation. When an act is conceived in clear and
precise terms, where the sense is manifest, and leads
to nothing absurd, there can be no reason to refuse
the sense which it naturally imports.*

*Vat. 369.

It is difficult to conceive of terms less equivocal
than those employed in the eighth article of the trea-
ty of eighteen hundred and seventeen. In truth,
they are so definite in their meaning, as to forbid the
application of any rules of construction. They de-
clare, that the reservee shall have a life estate, with
a reversion in fee simple to his children: Provided,
that if he remove from his reservation, then, and in
that case, the right shall revert to the United States.
The right to what? The right to the reservation,
most certainly. Whose right? The right of the
*reservee*, for his children had no right during his life:
and this right, (from the intrinsic force of the term
*revert*, and the nature of the subject,) is to return to
the United States, as they acquire it by the treaty,
*in fee simple.*

In order that the reservee might avail himself of
the provision made for him, it was necessary that his
name should be registered with the agent for the
Cherokees, before the census provided for by the
third article of the treaty, was taken; and it was
then the duty of the government to cause his reser-
vation to be allotted to him, as stipulated by the

eighth article, upon being satisfied that he was the head of a family. Conaleskce's name appears to have been registered in due time, and a reservation allotted to him.

The plaintiffs in error have, however, objected to the evidence by which these facts appear. The deposition of the Cherokee agent proves the registry of Conaleskee's name, within the proper time. It also furnishes a copy of the survey and platt of his reservation, duly entered with the agent. The deposition appears to have been regularly taken, and in our opinion, is not only evidence, but is the best evidence of the facts shewn by it. The original survey and platt are papers of such a character, as the Court would not have compelled the production of, had they been *within this State.* Sworn copies would *then* have been evidence—much more now, when they are beyond the reach of the process of our Courts, are copies, verified by oath, admissible as evidence—*Hamner* vs *Eddins.*[*] The appointment of [*3 Stewt, 192.] a surveyor, his acceptance, and a letter of instructions from the Secretary at War, are proved by copies, certified by the individual who presides over the office of Indian affairs, attached to the Department of War, whose official character is certified by the Secretary at War, under the seal of the War office. These documents certainly could not have been material evidence, in addition to the deposition of the Cherokee agent; but they are of such a character, however material, as to have authorised their admission, authenticated as they were.

The reservation of Conaleskee has then, been regularly made. The terms of the treaty invested

him with a life estate in it, liable to be divested by his removal; and had he continued to occupy it until his death, it would have passed to his wife and his children, in the same manner that lands holden in fee simple does, on the death of the husband and father.   The condition then, for a breach of which, the reservation was to revert to the United States, is a condition annexed to the life estate of the reservee: that condition being broken, the land *ipso facto* reverts, and the conditional expectancies of the wife and children are gone forever.

Thus having determined the character of the estate of Conaleskee, we proceed to the examination of the remaining questions.

2.  The estate of Conaleskee in his reservation was such, as to forbid him the right to make any disposition of it, incompatible with his own occupancy.   It is true, that he may have leased a portion of it, to continue for a period not beyond his removal or his life, retaining to himself the possession of the residue.   But he was unauthorised to make any disposition of a part or the whole of it, either by lease or sale, either for an indefinite period, or a time certain, which would, or might continue after his removal.   The lease to Eason, though it disposes of a part of the reservation only, is to continue for thirty years *absolutely*.   The conveyance to Kennedy professes to convey a fee simple estate in the entire reservation, and forbids the occupancy by Conaleskee, of any portion of it, with a view *to the pursuits of agriculture*, which the preamble to the treaty recites to have been the chief inducement to the provision for the heads of families,   The lease to Eason, and the

KENNEDY and MORELAND vs HEIRS OF M'CARTNEY

conveyance to Kennedy, were then, both unautho-
rised by the interest of Conaleskee in his reserva-
tion ; and in our opinion are void, not only for this
reason, but for their repugnance to the policy of the
treaties of eighteen hundred and seventeen and
eighteen hundred and nineteen. Without entering
into a disquisition upon this topic, we will content our-
selves with a reference to the authorities.— *Wheeler
vs Russell*[\*]—*Armstrong vs Toler*[†]— *Wilber vs How*[‡]
— *Belding vs Pitkin*[||]— *Hunt vs Knickerbocker*[§]—*May-
bin vs Coulon*[¶]—*Steers vs Lashly*[**]— *Waynell vs
Reed*[††]—*Howson vs Hancock*[‡‡]— *Wilkerson vs Lou-
donsack.*[||||]

3. It has been already said, that by the removal
of Conaleskee, his reservation become forfeited to
the United States—a continuance in possession be-
ing the condition on which his right depended.—
Where an estate is conveyed by the deed of an indi-
vidual or corporation, subject to be defeated by a
breach of a condition subsequent, if the condition is
broken, it is necessary that the grantor, or person
authorised, to take advantage of it, should either en-
ter, or do some other act equally effectual, in order
to divest the estate. But if an estate is granted by
a legislative act, (of which character treaties are by
the Constitution of the United States,) subject to
forfeiture by the happening of some future event—
if the event occur, no act is necessary to be done in
order to revest the estate in the government; it re-
vests immediately upon the happening of the contin-
gency. This distinction was recognized by this
Court, in the cases of the *University of Alabama* vs
*John J. Winston*,[§§] and *Thomas W. Gilll* vs *William
Taylor.*[¶¶]

[\*] 17 Mass. R. 256.
[†] 2 Wheat. 258.
[‡] 8 Johnson 444
[||] 2 Caine's R. 147.
[§] 5 Johnson 327.
[¶] 4 Dallas, 298.
[**] 6 T R. 61
[††] 5 ib.
[‡‡] 8 ib. 575.
[||||] 3 M &S.
117—Poth.
Ob. no, 43–55.

[§§] 5 St.&P. 17.
[¶¶] 3 ib 182

The act of May, eighteen hundred and thirty, gives to Conaleskee full authority to sell his reservation, upon the approval of a deed to be made by him, by the attorney for one of the districts of Alabama : *Provided,* he remove with his family, to his tribe west of the Mississippi, &c.   The record furnishes ample proof to shew that Conaleskee has complied with the. conditions imposed by the first *proviso* in the act.   His deed to M'Anulty conforms entirely to the second *proviso* ; and the ancestor of the defendants in error, having a regular conveyance of title from M'Anulty and wife, his heirs are well entitled to their action, to be let into the possession.

Where one sells land to which he has no right, with warranty of title, and he afterwards acquires a good title, it passes instantly to his vendee, and he is estopped from denying that he had no right at the time of his sale.   This rule only applies where the vendor had no valid title at the time of executing the deed, and not where he is inhibited from selling, by the letter, spirit or policy of a legislative act.

Here, the deed of Conaleskee to Kennedy, and his lease to Eason, are both absolutely void—having been made not only without the authority of the treaties, but in direct contravention of their policy. Kennedy then, in virtue of his deed of eighteen hundred and twenty-nine, was not remitted by the act of eighteen hundred and thirty, to an indefeasible estate in fee simple.

The first *proviso* in the act of eighteen hundred and thirty, clearly indicates, that in waiving a forfeiture, Congress contemplated a sale by Conaleskee of his reservation : in fact, it makes the removal of

himself and family, without charge to the government, a condition on which he could claim the benefit of the act. Why require the removal of himself and family, west of the Mississippi, if it was intended that he should continue the owner of the lands? The statute was passed with a view to an immediate sale, the proceeds of which were to defray the expenses of himself and family, to their new home.— This view of the act clearly negatives the idea that Conaleskee should hold for the benefit of any previous purchaser.

The view we have taken of this case shows that the lease from Conaleskee to Eason, and the deed from him to Kennedy, are both void, and pass no interest to the lessee and grantee. It thence follows, that the plaintiffs in error are justly chargeable with damages, equivalent to mesne profits, from the time, at least, that they had notice of a paramount title in another. And with the view to prove a demand, so as to fix a time from which they are liable to damages, we can discover no error, in the admission of the record of a suit commenced by the ancestor of the defendants in error, for the purpose of trying titles, and recovering damages to the land in controversy.

The other questions presented by the bill of exceptions, are so obviously embraced by those we have considered, that it is not deemed necessary, to examine them. Let the judgment be affirmed.