Wells v. Thompson.

---

## WELLS AND WELLS v. THOMPSON.

1. The failure of an Indian reservee, or his or her heirs, under the provisions of the treaty of the 24th March, 1832, with the Creek tribe of Indians, to take possession of the land allotted to them, or in any manner to signify a desire to remain in this state, after the five years expired, determined the estate to which they would otherwise have been entitled, and the land revested in the United States, without an entry, or other act on the part of its agents.

2. A marriage between a white man and a woman, who is of mixed white

and Indian blood, if made between parties able and willing to contract, and consummated, is valid under the law of this state. *Quere*—When a marriage is duly solemnized in this state, does not the strength and perpetuity of the marriage tie depend upon the marriage *domicil*, and not up on any subsequent residence of the parties in a heathen country?

3. A marriage solemnized in this state, is not dissolved by an abandonment of one of the parties, unless sanctioned by a divorce in due form.

4. The husband is a ten int by the curtesy, of waste and uncultivated lands, not held adversely by another, of which the wife had only the legal seizin, if the other incidents necessary to create the tenancy by curtesy exist.

5. The adultery of the husband is not a forfeiture of the tenancy.

6. Though the husband may forfeit his estate, as tenant by the curtesy, by a wrongful alienation, tending to the disherison of the reversioner, or remainder man, the sale of his interest as tenant, has no such effect.

Error to the Circuit Court of Macon.  Judgment by his Honor George W. Stone.

Trespass to try title, by the plaintiffs in error.  From a bill of exceptions it appears, that one Mary Wells, under the 2d article of the Creek treaty of the 24th March, 1832, was enrolled as the head of a family, and located on the land in controversy, and that the defendant was in possession at the commencement of this suit.  The plaintiffs are the children of Mary Wells, who was not more than one-fourth of Indian blood.

That in 1821, she was married to one William J. Wells, a white man, by an authorized officer in Monroe county, in this State, according to the laws of this State, and whilst residing among the whites, and out of the limits of the Creek tribe.  That shortly after the marriage, they removed within the limits of the Creek tribe, and remained domicilled with the tribe until the year 1828, when they with their children, the plaintiffs, went to the ten Islands, where Wells took up with another woman, and the said Mary repaired with her children, the plaintiffs, to her father's residence in the Creek territory.  After this, and before the treaty of 1832, Wells visited the residence of the father of the said Mary, and took and carried the plaintiffs, who were at that time minors, to the.

State of Arkansas, and neither he or the children returned to her during her life.

It was proved, that by the laws and customs of the Creek tribe, a man was allowed to take a wife, and abandon her at pleasure, and that this worked an absolute dissolution of the marriage state, and the parties were not allowed to marry again, until after the succeeding annual green corn dance. That the husband took no part of the personal effects of the wife by the marriage, and at her death her personal estate descended to her children, or next of kin. In regard to real estate, it was in proof, that each town had its regular possession under a separate control, worked in common, each occupying a suitable spot within the enclosure, the unappropriated soil being free to all. There was no such thing known among them as title to lands. That if a house was erected by the husband it belonged to him; if by the wife to her.

The defendant then proved, that about the year 1836, he purchased the land in controversy from Wells, for $1,800, and introduced and read a patent from the United States, to the defendant, for the land in controversy, issued on the 1st June, 1843, which recites that Mary Wells, wife of William J. Wells, by virtue of the treaty of 1832, became entitled to a tract of land, which is described; that Wells had sold the same to the defendant, with the approbation of the President of the United States, &c. &c. There was no proof that either Mary J., or William J. Wells, were ever in the actual occupation of the lands.

The defendant moved to exclude the patent from the jury, which the court refused, and he excepted.

The court charged, that if William J. and Mary Wells, were married in 1821, according to the law of Alabama, if he was living at the time of the treaty, and continued in life until 1836, his abandonment of his wife in 1828, did not work a dissolution of the marriage contract, though such might be the custom of the Indian tribe. That in that state of case, Mary Wells was not the head of a Creek Indian family, and should not have been located. That the defendant was estopped from denying that Mary Wells was located, but

it was competent for him to show that her husband, William J. Wells was the head of the family, and of right entitled to the location. That it was competent for the government to correct its own errors, and the patent, if the facts are believed, might be regarded as such correction by the government, by the act of its agent; and if said Wells, being the surviving husband of Mary, sold to the defendant, and pursuant to that sale the patent issued, they must find for the defendant.

The court refused to charge, that a change of the residence of Wells and his wife, to the Indian nation, his abandonment of her, and removal to Arkansas—the continued residence of Mary afterwards, she being of Indian extraction, in the Indian nation, was under the proof a dissolution of the marriage.

The court also refused to charge, that the act of the officer of the United States, appointed to take the census of the heads of Creek Indian families, determining Mary Wells to be the head of a family, and placing her name on the census roll, was conclusive on the government, and all persons claiming under it. The plaintiff excepted to the action of the court as stated in the bill of exceptions, and now assign it as error.

S. F. RICE, for plaintiffs in error.

1. A patent issued in violation of law, or obtained by fraud, is void. And the head of a Creek Indian family enrolled and located under the treaty of 1832, may show such enrollment and location to defeat a patent subsequently issued. Ladiga v. Rowland, 2 How. U. S. Rep. 581.

2. The Creek treaty of 1832, is itself the title of the head of a Creek family, to the half section of land on which such head of a family is located by the officer of the government; and this title is paramount to that conferred by a patent subsequently issued.

3. The location of the head of a Creek family upon a half section of land, by the officer of the government, under the Creek treaty of 1832, is conclusive upon the government, and all persons claiming under the government by purchase subsequent to the location. Crommelin v. Minter, 9 Ala. R.

594; 8 Smedes & Mar. R. 234; Hit-tuk-ho-m₁ v. Watts, 7
Ib. 363; Smede's Dig. 179, § 12.

4. The recitals in a patent are conclusive upon the party
claiming under it. And as the patent to the defendant in
this case distinctly admits, that the mother of the plaintiffs
was entitled to the land by the treaty of 1832, that admission
estops the patentee (as well as the government) from deny-
ing the plaintiff's title—when it is shown that the plaintiffs
are the heirs at law of Mary Wells. (The laws of Alabama
were extended over the Creek territory on the 16th day of
January, 1832, and long before the death of plaintiff's mo-
ther; and therefore her children are by that law enti-
tled to her rights in the land.) Brasher v. Williams, 10
Ala. Rep. 630. See the act of 16th January, 1832, entitled
" an act to extend the jurisdiction of the State of Alabama,"
&c. &c.

5. Marriage in Alabama has ever been dissoluble. A mar-
riage between a white man and a Creek Indian woman, in a
county (Monroe) subject to the jurisdiction of the laws of
Alabama, may be dissolved according to the laws and cus-
toms of the Creek tribe, if the parties acquired an actual *bona
fide* domicil in the Creek nation before the dissolution, and
before the laws of Alabama were extended over the Creek
Indian territory. Story's Confl. of L. § 230, a, 2d ed.; Dor-
sey v. Dorsey, 1 Chand. L. Rep. 287, 289; Wall v. William-
son, 8 Ala. Rep. 48; Wall v. Williams, 11 Ib. 826.

6. " While the parties remain subject to our jurisdiction,
the marriage is dissoluble *only by our law*; when they are
remitted to another, it is incidentally remitted along with
them." Story's Confl. of L., *supra;* Wall v. Williamson, 8
Ala. Rep. 48.

7. The dissolution of the marriage between Mary Wells,
and her husband, occurred many years before 1832, when
the laws of Alabama were extended for the first time over
the Creek territory. The Indian law was the only law of
force in that territory, when the dissolution of the marriage
occurred. And it would be a most harsh and unjustifiable
mode of construing the treaty of 1832, to say that Mary
Wells was entitled to nothing under it, although by the
Creek Indian law, she was completely divorced from her

husband.   In the construction of this treaty, and in all acts
done under it, the customs and laws of the Creek tribe have
been carefully observed and regarded.    The very terms used
in the treaty, "every head of a Creek Indian family," ne-
cessarily imply that regard was to be paid to the Indian laws
in determining their family relations.    Wall v. Williams, 11
Ala. R. 826.

8. The patent being void, is void for all purposes; and
could not be good to transfer to defendant the curtesy of the
husband, even if he had been tenant by the curtesy.    But
it is manifest that he was not tenant by the curtesy, for ma-
ny reasons—one of which is, that he was divorced from his
wife long before the Creek treaty of 1832, and before either
had any interest in the land.    And "the effect of this disso-
lution of the marriage, according to the Indian laws, is the
same in the courts of Alabama, as if directed by a lawful de-
cree."    Wall v. Williamson, 8 Ala. R. 48; Wall v. Williams,
11 Ala. R. 826.

9. The title of the plaintiffs is clearly made out to the
land.    And every point ruled against them on the trial, was
a violation of the law of the country.    See the cases above
cited.


McLester and Belser, for defendant in error.

1. The marriage between Wells and his wife in 1821, was
properly proved.    The marriage itself was neither polyga-
mous or incestuous, and such a contract, in a civilized coun-
try, exists throughout time, unless it be annulled by death or
by some legal decree.    See Corn v. Norcross, 9 Mass. 492;
Fenton v. Reed, 4 Johns. 53; 16 Mass. 157; Milford v. Wor-
cester, 7 Mass. 52; Car. Law Jour. 94, 377.

2. The marriage having taken place among the whites,
and in accordance with their law, Wells became and contin-
ued, the head of the family.    The case is different from that
of a union between two persons of the Indian tribe, entered
into according to the usage of the tribe, and at a time and
place, when and where, their laws were in force.    See Sto.
Confl. Laws, 122; Wall v. Williamson, 8 Ala. 48; Wall v.
Williams, 11 Ala. 826.

3. The plaintiffs are concluded by the action of the govern-

ment. The patent has issued—the matter has been settled by a competent tribunal. The record shows no such case as that of Sally Ladiga, settled by the supreme court of the United States. It comes within the principle of some of the decisions of this court. See Sally Ladiga's Case, 2 Howard, 581; Parsons's Heirs v. Inge's Heirs, 5 Porter, 327.

4. The bill of exceptions does not show to whom the real estate of an Indian descends, according to the custom of the Creek tribe. In the absence of such proof, our law must govern. If our law governs, then, there is no evidence of the death of Wells, before the commencement of the suit. If Wells is alive, (and this is the presumption, until the contrary is made to appear,) even if his wife was the owner of the land, still his transferee can hold it during the life of Wells; therefore, plaintiff's suit must abate. See McLain v. Gregg, 2 A. K. Marsh. 454; Conly v. Porter, 12 Ohio, 79; Davis v. Mason, 1 Peters, 503; Jackson v. Lellech, 8 Johns. 202; Clute v. Miller, 2 Cowen, 439.

5. There is nothing in the record, going to prove that Mrs. Wells was the head of a family, *independent* of her husband, at the date of the treaty of 1832, or when she was located on the land. If the location was unauthorized, her heirs have no right to complain.

COLLIER, C. J.—By the treaty of the 24th of March, 1832, the Creek tribe of Indians ceded to the United States all their land east of the Mississippi river. The United States engaged by the same instrument to survey this land as soon as the same could be conveniently done, and when surveyed to allow ninety principal chiefs of the tribe to select one section each, and every head of a Creek family to select one half section each, " which tracts shall be reserved from sale for their use for the term of five years, unless sooner disposed of by them. A census of these persons shall be taken under the direction of the President, and the selections shall be made so as to include the improvements of each person within his selection, if the same can be so made, and if not, then all the persons belonging to the same town, entitled to selections, and who cannot make the same, so as to include their improvements, shall take them in a body in a proper form." It

is provided by the third article of the treaty, that "these tracts may be conveyed by the persons selecting the same, to any persons for a fair consideration, in such manner as the President may direct. The contract shall be certified by some person appointed for that purpose by the President, but shall not be valid till the President approves the same. A title shall be given by the United States on the completion of the payment." The fourth article declares, that "at the end of five years, all the Creeks entitled to these selections, and desirous of remaining, shall receive patents therefor in fee simple from the United States."

Without stopping to inquire what the law may be, upon the point, it may be conceded that the enrolment of the name of Mary Wells as the head of a Creek family, and the allot-ment to her as such, of the land in controversy, gave her *prima facie* a legal estate, on which she might maintain an action for the recovery of the possession against an intruder. It may also be conceded that if she died before the expiration of five years, without conveying the same as provided by the third article, that her interest did not revert to the United States, but descended to her heirs to be disposed of by them, if adults, or to hold under the provisions of the fourth article. But in the case before us, it does not appear the reservee was in possession, or asserted her right to the land by conveying it, or otherwise ; and although she died within the five years, her heirs did not within that time set up their claim to it. In fact, previous to the treaty, they removed with their father to Arkansas, and did not again return to Alabama until after the death of their mother.

The title acquired by the "head of a Creek family" under the treaty, was to continue for five years, unless it was sooner conveyed with the approval of the President ; but if there was no such conveyance, it reverted to the United States, unless the reservee or his heirs were desirous of remaining in the country after the expiration of that period. True, this is not explicitly declared, yet it follows from the terms employed in the fourth article, in which the United States stipulate to issue patents to all the reservees who are "desirous of remaining" "at the end of five years." All the title of the Indian tribe passed from it, and the federal gov-

ernment became the proprietor of the fee in the territory they had previously occupied. The government engaged, among other things, to allot half sections of land to each head of a family, to be enjoyed for five years absolutely, and in fee upon certain conditions. Here was the grant of a fee simple estate, defeasible on the happening, or rather the not happening of the event specified. If the condition was not performed as provided, the title of the reservee determined, and the land re-vested in the United States without an entry, or other act on the part of its agents. See University of Ala. v. Winston, 5 Stewt. & P. Rep. 17; Gill v. Taylor, 3 Port. Rep. 182; Kennedy & Moreland v. McCartney's Heirs, 4 Port. Rep. 141; Crommelin v. Minter, et al. 9 Ala. R. 594, 600. If this view be correct, it follows that the failure of the reservee or her heirs to take possession of the land allotted to her, or in any manner signify a desire to remain in this State after the five years expired, determined the estate to which they would have been otherwise entitled.

This interpretation of the treaty is enforced by an act of Congress of the 3d of March, 1837, which authorizes the President to cause all reserves belonging to the Creek Indians by virtue of the treaty, and remaining unsold on the fourth of April thereafter, (precisely five years after the treaty became operative,) to be sold at public auction, &c. The second section of the act authorizes the President to confirm the sales made by the widow, the widow and children, the children, or the lawful administrator of Creek Indians who had died or might die prior to the fourth of April, without having legally disposed of their reserves, and to receive the unpaid purchase money, &c. By the third section, the President is invested with a discretion in the investment and paying over to the persons entitled, the money received from the purchasers of reserves. 5 U. S. Stat. by Peters, 186. The terms of this enactment go quite beyond what the terms of the treaty justify, and profess to direct the sale of all reserves, and of course those where the reservee is "desirous of remaining." But in respect to reserves, the allottees of which do not come within the latter category, and have not conveyed their interests, the act is potent to show that Congress

101

supposed they reverted to the United States immediately upon the expiration of the period prescribed by the treaty. The statute could not have been enacted upon any other hypothesis. This is indicated by the provision for confirming irregular sales, and the discretion conferred in respect to the purchase money to be received under the direction of the President, as well as the power assumed by the first section of the act.

There is perhaps another objection to the plaintiff's title equally fatal to their right to recover in the present action, as that we have considered. Mrs. Wells was of Indian extraction, but not more than one fourth Indian blood, and married Wm. J. Wells, according to the laws of Alabama, in Monroe county, in 1821, where they both resided. Shortly after their marriage, they removed into the country occupied by the Creek tribe, where they resided until 1828, when they again moved to the "Ten Islands" with their children (the plaintiffs.) At this latter place the husband formed an adulterous connection with another woman, and Mrs. Wells left him with her children, and went to her father's house in the Creek territory, whither he had removed after her marriage in 1821. There is no law of this State, which inhibits the marriage of a white man with a woman whose blood partakes of the white and Indian races; and if such a marriage is consummated between persons able and willing to contract, the parties become subject to all the disabilities, and are entitled to all the rights and privileges incident to such a relation. See Frank and Lucy v. Denham's Adm'r, 5 Litt. Rep. 530.

Monroe county was the domicil of both the parties at the time they were married, and it cannot be inferred that they then contemplated a residence without the jurisdiction of Alabama. Their subsequent removal to the Creek territory did not *ipso facto* dissolve their connection. Even conceding that they became affiliated with the tribe, did the customs of the nation in respect to marriage, so revolting to Christianity, furnish rules by which the obligations and duties of that state—its permanency and incidents, when solemnized in a civilized country, should be ascertained and determined? We should long hesitate before we would give to this question an affirmative response. It involves other considera-

tions than those which have arisen upon the discussions whether the strength and perpetuity of the *vinculum fidei* depends upon the domicil of the marriage, or the subsequent residence of the parties. See Story's Confl. of Laws, 188 to 192, and citation in the notes; 2 Clarke & F. Rep. 488. But however this question may be settled when it shall come up in judgment, is perhaps not now a material inquiry; for it does not appear that Mrs. Wells separated from her husband until they had fixed their residence at the Ten Islands. The bill of exceptions does not inform where these islands were located, but we must judicially know their position, and that they are in a river, which in 1828 formed a dividing line between the Creek tribe and the settled portion of Alabama; and from the manner in which the facts are stated, the fair inference is, that Mrs. Wells and her husband settled west of the line. Mrs. Wells then abandoned her husband within the jurisdictional limits of this State, and by such an abandonment unsanctioned by a divorce in due form, their marriage could not be dissolved.

The marriage, then, of W. J. Wells with the plaintiffs' mother, and the birth of issue capable of inheriting, being proved, the husband became tenant by the curtesy *initiate* of the inheritable estate of his wife in lands, and by the death of the wife this tenancy became *consummate.* By the common law as administered in England, it was essential to an estate by the curtesy that the wife should have had an actual seizin or possession of the land, and not a bare right to possess, which is a seizin *in law.* 1 Step. Com. 246, *et seq.* But this rule has been relaxed in this country; and if the wife be the owner of waste, uncultivated lands, not held adversely, she is deemed seized in fact, so as to entitle her husband to his right of curtesy. The title to such property draws to it the possession; and that constructive possession continues in judgment of law, until an adverse possession be clearly made out. 4 Kent's Com. 29, *et seq.* It is said that curtesy applies as well to qualified or conditional, as to absolute estates in fee. Id. 32; 8 Johns. Rep. 262; 1 Pet. Rep. 506; 5 Cow. Rep. 574.

The bill of exceptions does not inform us whether the land in question was occupied during the lifetime of Mrs.

Wells under an adverse claim, and it may be inferred that it was not, as the husband sold it several years after her death to the defendant and others. The reservee, then, had such a constructive possession as would invest her husband with an estate by the curtesy, if the interest which the United States gave her still continues; and during his life the right of entry and possession cannot vest in the plaintiffs as the heirs of their mother.

Although the statute of Westminster the 2d declares, that the wife's dower shall be lost by her adultery, no such misconduct on the part of the husband will work a forfeiture of his curtesy. And it has been said that the forfeiture of the wife's estate by her act will not defeat the curtesy. 4 Kent's Com. 34.

The husband, as well as any other tenant for life, may forfeit his curtesy by a wrongful alienation, or by making a feoffment, or levying a fine importing a grant in fee, suffering a common recovery, joining the *mise* in a writ of right, or by any other act tending to the disherison of the reversioner or remainder-man. 4 Kent's Com. 34. This is the rule of the English common law, and it seems has been recognized in Maine. 21 Maine Rep. 372. But in McKee v. Pfout, 3 Dall. Rep. 486, it was held, that a conveyance in fee by a tenant by the curtesy, though by indenture duly recorded, and with a covenant of special warranty, is not a forfeiture of the estate.

In the case at bar, there is nothing in the record to indicate that W. J. Wells attempted to convey to his vendees a greater interest than his estate by the curtesy. The recital in the patent is, that the land had "been duly sold and conveyed by William J. Wells, to Julian S. Devereux, Moses Thompson, and Weldridge C. Thompson, as appears by the conveyance thereof, dated the 3d day of March, 1836, approved by the President of the United States the 18th day of September, 1841, and deposited in the general land office of the United States." The inference from this is, that the vendor transferred his estate in the land to the vendees according to law; and this conclusion is strengthened by the fact, that the usual form of conveyances by reservees under the treaty, was nothing more, in legal effect, than a relinquishment

of their title to the purchaser named in the contract. So that, conceding the strict rule of the common law to be applicable in this state, it is not shown that the husband's curtesy has been forfeited by a conveyance of the fee.

We do not intend to be understood as asserting that the estate of W. J. Wells, as a tenant by the curtesy, or otherwise, continued beyond the 4th of April, 1837. But if the interest of Mrs. Wells, as derived from the treaty, and her subsequent recognition as the head of a " Creek family," survived that period, it will not descend to the plaintiffs during the life of their father, but vests in the latter, or his assignees, to be enjoyed until his death.

It is not material to consider other questions discussed as to the effect of the evidence of title set up by either party. The plaintiffs, we have seen, have failed to show such a right as will sustain their action ; and as they must recover upon the strength of their own claim, and not upon the weakness of that of their adversary, we will not stop to examine the pretensions of the defendant. We have but to add, that the judgment of the circuit court is affirmed.

CHILTON, J., not sitting.