Corprew v. Arthur et als.

---

## CORPREW v. ARTHUR et als.

1. A voluntary conveyance is good, as well against subsequent purchasers from the grantor, with notice, as against subsequent creditors, unless it be shewn that it was intended to defraud creditors.

2. If A., an Indian reservee under the Creek treaty of 1832, by arrangement with W. procures his reservation to be certified by the government agent, as sold to W., in order that W. may obtain the patent, and then convey the land in fee simple, to A., it is a fraud upon the government, and a court of equity will not interfere in a controversy between the parties or their assignees.

3. If an Indian reservee under the Creek treaty of 1832, fails to sell and convey his reservation, in five years, in the mode prescribed by the treaty, and at the end of that period manifests no desire to remain in the State, his reservation will revert to and revest in the United States, without an entry or other act on the part of its agents.

4. To convert the grantee of an absolute deed, into a trustee, the evidence should be clear, and satisfactory.

Error to the Chancery Court of the 15th District. Before the Hon. David G. Ligon, Chancellor.

THE bill in this case was filed by plaintiff in error, against the defendants, Gideon Arthur and the heirs of John J. Williams, and alledges, that prior to the year 1833, said Arthur, a white man, residing in the Creek Indian territory, now included in the county of Chambers, by intermarriage with a woman of the Creek nation, became identified as a member of said Indian tribe, and as such, under the treaty of 1832, was located on the north half of section of land eleven, in township twenty-two, and range twenty-eight in said county ; that about the year 1834, said Arthur and John J. Williams formed a partnership for the purpose of trading with the Indians, and buying their lands ; and that with the view of inspiring confidence on the part of the Indians in said Williams, the said Arthur certified to him his said reservation, without consideration or compensation for the same, relying on the good faith of Williams to make him a title, after the patent issued, whenever said Arthur might demand it : that the patent subsequently issued to said Williams : that from the time of Arthur's location on the land till 1843, he resided on, and cultivated it, and that in 1843, having become wholly insolvent, he abandoned the possession, and removed to parts unknown : that said Williams is dead, and that on no occasion in his life time, did he set up any claim to said land, but frequently acknowledged that it was the property of said Arthur : that in 1839 plaintiff had become Arthur's security on several debts due by him—one to Mrs. Elizabeth Gray, for $1,200—one to the Branch Bank at Montgomery, for $280, and divers others, which he is not able to mention : that to secure the plaintiff against his liability for said debts, as well as any future liabilities he should incur for the benefit of said Arthur, the said Arthur on the 28th August, 1830, executed to him a mortgage on the said land : that after the execution of this mortgage, plaintiff became the surety of said Arthur on various other demands, on one of which a judgment has been obtained against him by one Jonathan Bonner, upon which he has paid $111, and will have to pay the additional sum of $104 . that to another judgment, in favor of Mrs. Brodnax, he has paid $113 55, to another in favor of Thomas Noble he has paid $40, and to another in favor of John D. Hurst, about $20 : that he has also paid to the

sheriff of Chambers $145 25 in a chancery suit of one Whitaker against said Arthur, $31 72, supreme court costs in case of Mrs. Brodnax v. Arthur, and various other demands, which he will prove, when an account may be ordered : that plaintiff is still liable on, and will have to pay the debts due to Mrs. Gray and the Branch Bank, and others of smaller amounts, which, in the aggregate, amount to more than the value of the said land : and that the said heirs of John J. Williams, claim title to said land by descent, and refuse to make title to Arthur, &c.

The prayer of the bill is for a foreclosure of the mortgage, and for an account : for a divestiture of the title of the heirs of said Williams in the land, and that the land be sold, and the proceeds applied to the payment of said debts, &c.

The bill was taken as confessed against Arthur. The irs of Williams answered, and set up several defence :

1. That Arthur had the land certified to Williams, to enable Arthur to procure a *fee simple* title to it, in fraud of the treaty, and that Corprew had a notice of the issuance of the patent to Williams.

2. That Williams paid Arthur at the time of the certification, $1000, and a vebal agreement was then entered into between them, that Williams was to hold the land and convey it to Arthur, whenever he refunded the money ; which he has never done.

3. That by a subsequent arrangment between Williams and Arthur, Williams was to hold the land as security for debts due to him by Arthur.

The evidence establishes the first ground of defence, but was conflicting as to the third and fourth grounds ; and as the opinion of the court rests mainly on the first ground, and other facts in the case, without reference to the conflicting testimony, it is deemed unnecessary to insert it.

The chancellor dismissed the bill, which is now assigned as error.

HEYDENFELDT, for plaintiff in error.
RICE, contra.

COLLIER, C. J.—It may be conceded, that a convey-

ance, without valuable consideration, by one indebted at the time, is fraudulent at law against *existing creditors*, and the *intention of the donor* determines the validity of such conveyance as against *subsequent creditors*. Cato v. Easley, 2 Stew. Rep. 214; Miller v. Thompson, 3 Port. Rep. 198; Hanson v. Buckner, 4 Dana's Rep. 251.

Our statute of frauds, in declaring the effect of fraudulent conveyances, substantially embodies the provisions of the 13th and 27th Eliz. Although, in respect to the first, it is settled that the intention of the parties is the ruling point in determining the validity of a voluntary conveyance as against the subsequent creditors of the grantor, yet the modern English decisions maintain that such conveyance is void under the 27th Elizabeth, against a purchaser for a valuable consideration, though he have notice of its existence. Upon a former occasion, I said it was doubtless the design of the latter statute to avoid transfers of property intended to defraud purchasers, and the *quo animo* a gratuitous transfer of property was made, was always a material inquiry; and if there was no fraud in fact, it should be upheld against a purchaser with notice. See my opinion in Frisbie v. McCarty, 1 Stew. & P. Rep. 68. In Cathcart et al. v. Robinson, 5 Pet. Rep. 264, it was said, "that the supreme court of the United States, in expounding a statute, adopted the construction of the courts of the country where the statute was enacted; but this rule may be susceptible of modification, when applied to British statutes adopted in any of the American states. By adopting them, they become our own, as entirely as if they had been enacted by the state. The construction which British statutes had received in this country —indeed to the time of the separation of this country from the British empire, may very properly be considered as accompanying the statutes themselves, and forming an integral part of them. But however subsequent decisions may be respected, their absolute authority is not admitted. If the English courts vary their construction of a statute which is common to both countries, we do not hold ourselves bound to fluctuate with them. At this day in England, a voluntary conveyance is held to be absolutely void, under the statute of the 27th Elizabeth, against a subsequent purchaser, even

although he purchased with notice. These decisions do not maintain that a transaction valid at the time, is rendered invalid by the subsequent act of the party : they do not determine that the character of the transaction is changed; but that testimony afterwards furnished, may prove its real character. The subsequent sale of the property is carried back to the deed of settlement, and considered as proving that deed to have been executed with a fraudulent intent to deceive a subsequent creditor."

"At the commencement of the American revolution, the construction of the 27th Eliz. seems not to have been settled in England. The leaning of the courts towards the opinion, that every voluntary settlement would be deemed void as to a subsequent purchaser, was very strong ; and few cases are to be found in which such conveyance has been sustained. But these decisions seem not to have been made on the principle that such subsequent sale furnished a *strong presumption* of a fraudulent intent; which threw upon the person claiming under a voluntary conveyance, the burden of proving it, from the conveyance itself, or from extrinsic circumstances, to be made in good faith; rather than, as furnishing *conclusive evidence*, to be repelled by no circumstances whatever. The modern English decisions, (add the court,) which establish the conclusiveness of a subsequent sale to fix fraud upon a transfer or settlement of property, made without valuable consideration, seem to the court to go beyond the construction which prevailed at the revolution, and not proper to be followed in this country." See Sugden on Vend. 474 to 479. The English construction, it must be admitted, has been adopted in some of the states. Ricker v. Ham, 14 Mass. Rep. 137; Clapp v. Tirrell, 20 Pick. Rep. 247; Barrineau v. McMurray, 3 Brev. Rep. 204; Tate v. Liggatt et al. 2 Leigh's Rep. 84; Bell et al. v. Blaney, 2 Murp. R. 171.

We have never adopted the provisions of the 13th and 27th Eliz. *in extenso*. Our statute of frauds, declares that every gift, grant, or conveyance of lands, tenements or hereditaments, goods or chattels, &c., had of malice, fraud, &c., to the intent or purpose to delay, hinder or defraud creditors of their just and lawful actions, &c.; or to defraud or to deceive

those who shall purchase the same lands, tenements or hereditaments, &c.; "shall be from henceforth deemed and taken only as against the person or persons, his, her, or their heirs, successors, executors, administrators or assigns, and every of them whose debts, suits, demands, estates, or interests, by such guileful and covinous devices and practices as is aforesaid, shall, or might be in any wise disturbed, hindered, delayed or defrauded, to be clearly and utterly void; any pretence, color, feigned consideration, expressing of use, or any other matter, or thing, to the contrary notwithstanding." Clay's Dig. 254, § 2. This statute was enacted in 1803, before the English decisions to which allusion has been made settled the interpretation of the 27th Eliz. according to the rule, as at present acknowledged. This consideration, and the difference of phraseology in the several enactments, leave us free to adopt such construction of our own act as may best comport with the language employed, and most certainly advance the legislative intention. These ends, we incline to think, can only be subserved by holding, that one who purchases for a valuable consideration, *with notice* that his vendor had made a previous voluntary conveyance, will not be preferred. But we pass from this point, for the present.

By the treaty of the 24th March, 1832, the Creek tribe of Indians ceded to the United States, all their lands east of the Mississippi river. The United States stipulated to survey this land as soon as it could conveniently be done, and when surveyed, to allow ninety principal chiefs of the tribe, to select one section each, and every head of a Creek family to select one half section each, "which tracts shall be reserved from sale for their use, for the term of five years, unless sooner disposed of by them," &c. It is further provided, that "these tracts may be conveyed by the persons selecting the same, to any persons, for a fair consideration, in such manner as the president may direct. The contract shall be certified by some person appointed for that purpose by the president, but shall not be valid till the president approves the same. A title shall be given by the United States, on the completion of the payment." It is also declared, that "at the end of five years, all the Creeks entitled to these se-

lections, and desirous of remaining, shall receive patents therefor, in *fee simple* from the United States."

Under this treaty, it has been holden that the enrolment of the name of the head of a Creek family, the allotment to him, and his location as such, of a half section of land, conferred *prima facie* a legal estate, on which the reservee might maintain an action for the recovery of the possession, against an intruder. The title thus acquired was to continue for five years, unless it was sooner conveyed, with the approval of the president; but if there was no such conveyance, it reverted to the United States, unless the reservee, or his heirs, were desirous of remaining in the country after the expiration of that period. By the treaty, all the title of the Indian tribe was relinquished to the federal government, and the government were to grant to each head of a family a *fee simple* in the quantity of land designated, defeasible on the happening, or rather the not happening, of the events specified. If the reservee did not alienate within the five years, or upon the expiration of that time make known his intention to remain in the country, the land re-vested in the United States, without an entry, or other act, on the part of its agents. These conclusions were attained upon a construction of the treaty, and was enforced by the subsequent legislation of Congress upon the subject. See Wells v. Thompson, 13 Ala. Rep. 793, and citations by the court. See Clarlitko v. Elliott, 5 Port. Rep. 403; Rosser v. Bradford, 9 ib. 354; Herring v. McElderry, 5 ib. 161.

The sale by Arthur to Williams, if intended not to transfer the absolute right to the vendee, but merely to divest the title of the United States, that the vendor might occupy or dispose of it, unincumbered by any condition, was in direct violation of the treaty. Or the object of the parties was to deceive other reservees by holding out a false lure, and thus induce them, under the influence of Arthur's example, to sell their reservations to Williams, that the latter might derive a profit from the purchase. In either case, the contract would be *contra bonos mores*, and a court of justice would not lend its aid to the vendor to vacate his conveyance; in such case, the rule *in pari delicto, potior est conditio possidentis*, applies with all force. Public policy inhibits the enforcement of

Corprew v. Arthur et als.

contracts in violation of positive law, or which are founded in a fraud upon the rights of others, and are opposed to good morals. Roberts v. Gibson, 6 H. & Johns. Rep. 116; Carrington v. Caller, 2 Stew. Rep. 175; Boyd v. Barclay, 1 Ala. Rep. N. S. 34. The contract between Arthur and Williams, according to the testimony of some of the witnesses, is obnoxious to both the objections supposed; and the bill itself expressly alledges the second, as a ground why the conveyance should be set aside. There can, then, be no doubt, that if the principle we have stated be adhered to, the sale by Arthur cannot be set aside at his instance, and that Williams cannot be treated as a trustee, holding for his benefit.

Let it be conceded, that the mortgagee is a creditor by specialty, (Coote on Mortg. 457); and that he is also a purchaser within the 27th Elizabeth, so as to avoid a prior voluntary settlement under that statute, (Id. 355), and still the complainant is not entitled to the relief he seeks against the heirs of Williams. It is not pretended that the complainant was a creditor of Arthur, until long after he conveyed his reservation, and it is perfectly certain, that he had no lien upon it, even if it was competent for a reservee to sell, or incumber it, otherwise than the treaty provides, or of his defeasible estate, was subject to levy and sale under execution. James v. Scott, 9 Ala. Rep. 579. And as a subsequent purchaser, he cannot claim the right to subject the land to the payment of his demands, without showing that the conveyance was not only voluntary, but was intended to defraud creditors. Griffin v. Doe ex dem. Stoddard and Murphy, 12 Ala. Rep. 783. The bill makes no such allegation, and if it did, it would not be supported by the proof.

The heirs of Williams cannot be treated as trustees for the complainant, considering him as a purchaser. If the purchase of their ancestor is sustained, then they will hold in their own right; for it will not be upheld for the benefit of those, who deduce a paramount claim through the vendor. The most that the complainant can ask is, that the deed under which the defendants claim title, be annulled, and that the interest which Arthur would have under such circumstances, be subjected to the satisfaction of his claims against the latter.

If we lose sight of the conveyance by the reservee to the plaintiff, it is clear, upon the authority of Wells v. Thompson, *supra*, the bill itself shows he has no title. He had the right to sell and convey a fee-simple within five years, in the manner prescribed by the treaty; if he failed to do this, and at the end of five years, manifested no desire to remain in the country, his reservation reverted to the United States. No act on the part of the government was necessary to re-invest it, with all the title which was ceded by the treaty. See University v. Winston, 5 Stew. and P. Rep. 17; Gill v. Taylor, 3 Port. Rep. 182; Kennedy & Moreland v. McCartney's heirs, 4 Ib. 141; Crommelin v. Minter, et al. 9 Ala. Rep. 594; Wells v. Thompson, *supra*.

The United States has recognised the conveyance of the reservee as passing all the interest which the treaty authorized him to transfer—its effect was to divest his estate, so as to leave nothing to be reached by creditors, or subsequent purchasers. If the patent was obtained by a fraud upon the United states, perhaps the government may assert its right to the reservation, as forfeited, and obtain a decree to vacate the patent. However this may be, neither the bill, or proofs, present a case which entitles the complainant to a decree of foreclosure against the heirs of Williams, or show any interest in the mortgagor.

We have thus seen that the law of the case, is against the complainant; and we are inclined to think if it were otherwise, the bill is not sustained by the proofs. The evidence required to make out a trust, or a fraud, so as to convert the grantee of an absolute deed into a trustee, or to annul the deed, should be clear and satisfactory. So far from establishing that Williams had advanced no money to Arthur, for the reimbursment of which he was to hold the land, we are inclined to think that the most reliable proof, (judging from the manner in which the witness express themselves, and the circumstances under which they acquired a knowledge of the facts they narrate,) tend rather to establish the reverse. The view we have taken, does not require us to examine the facts. Our conclusion is, that the decree must be affirmed.

CHILTON, J., not sitting.