# REPORTS

OF

# CASES ARGUED AND DETERMINED

AT JUNE TERM, 1852.

## ROWLAND AND HEIFNER vs. LADIGA'S HEIRS.

1. A female belonging to the Creek tribe of Indians, whose husband was dead, but with whom a grand-child resided, whose parents were also dead, is "the head of a family" within the meaning of the second article of the treaty of March 24, 1832, between the United States and that tribe of Indians.

2. Every head of a family of that tribe who resided on a half section of land, and selected it as his reservation under the treaty, became thereby entitled to it; and his right could not be divested by the refusal of the locating agent to locate him upon it.

3. The head of a family who made his selection, and was located upon his reservation, could only be divested of his right within five years, by a sale in accordance with the provisions of the treaty, or by abandoning the land; but if he neither sold or abandoned it within that time, his title became perfect and indefeasible.

4. Where an Indian reservee, the head of a family, made application to the locating agent to be located on her reservation, which application was improperly refused, and she continued to reside on the land until interrupted in her possession by intruders, and then went to a relative's to reside, this is not an abandonment of the land, notwithstanding she is afterwards removed from the country by the force of the Government.

5. The right of an Indian reservee, which he has not conveyed by sale, nor lost by abandonment, descends to his heirs at law.

6. When evidence is objected to as a whole, and a part of it is admissible, the objection may be overruled.

7. To show that she was "the head of a family," plaintiff had proved that her grand-child, a boy whose parents were dead, resided with her; and then offered to prove that she bought clothes for him, to which proof defendants objected. *Held:* That the evidence was admissible.

8. If trespass to try title is brought to recover the freehold, and the plaintiff dies pending the suit, it may be revived in the names of his heirs at law.

2

Rowland and Heifner v. Ladiga's Heirs.

9. The court may require some evidence of heirship, before allowing the suit to be revived, but its action in reviving without sufficient evidence of the heirship cannot be reviewed in the Appellate Court, even if the revivor is made without any proof at all; for the defendant may contest the heirship upon the trial before the jury.

10. In questions of pedigree, the declarations of deceased members of the family have always been received in evidence, to establish the parentage or descent of the particular individual whose relationship is the subject of investigation.

11. One who has title to land may bring one suit against all the tenants in possession of it, although they may severally possess distinct portions of it; and the defendants may protect themselves from a joint judgment for damages by showing the character and extent of their possession.

12. Where the plaintiff's right to recover depends upon three or more distinct facts, a charge which assumes that he may recover if only two of those facts are established, is erroneous, if unexplained by other instructions; and the judgment will be reversed for the error, although the bill of exceptions recites that "other charges were given," which are not set out.

(Phelan, J., *dissenting*, held, that if an affirmative charge touching the merits of the action is correct, it should not be held erroneous because it does not likewise embrace formal and technical matters, unless exception is taken in the court below for that reason.)

ERROR to the Circuit Court of St. Clair.

Tried before the Hon. John D. Phelan.

This was an action of TRESPASS, brought by Sally Ladiga, a Creek Indian, against Richard D. Rowland and Peter Heifner, to try titles to the east half of section two, in township fourteen, range eight east, of the Coosa Land district. The suit was commenced in the Circuit Court of Benton county; and a trial was there had, at the April term, 1846, which resulted in a verdict for the defendants; but a new trial was granted, and the venue was changed to the county of St. Clair, on the condition that the plaintiff paid all the costs that had accrued, by the first day of August then next following.

At the May Term of the Circuit Court of Benton, an entry was made upon the record, showing that the clerk had failed to transmit the papers, as he had been directed, to the Circuit Court of St. Clair; and the order for the change of venue was renewed, and the clerk directed to transmit all the papers and orders in the cause. At the September Term, 1847, the plaintiff moved the Circuit Court of St. Clair, to have the cause entered upon the docket of that court, as one there

Rowland and Heifner v. Ladiga's Heirs.

pending, and produced the papers and orders showing the change of venue. The defendants resisted this motion, on the ground that the cause had been finally disposed of by the Circuit Court of Benton; but the court granted the motion, and the defendants excepted.

At the March Term, 1849, the death of the plaintiff, Sally Ladiga, was suggested, and the present defendants in error moved the court to revive the suit in their names as her heirs at law; and in support of the motion, they offered in evidence the deposition of one Frye, and also proved the common reputation among the Indians that they were the children and grand-children of said Sally Ladiga. The defendants objected, that the evidence was insufficient to establish their heirship; but the court, deeming it sufficient, granted the motion, and ordered the suit to be revived in the names of the present defendants in error as plaintiffs, and informed the defendants that they might contest the heirship of the plaintiffs, either by special plea in bar, or under the general issue before the jury.

A trial was then had, upon the plea of "not guilty," pleaded separately by each defendant, and a verdict of "guilty" was rendered against them, and five dollars damages assessed against each; and it was further found by the verdict, that the defendant Rowland was in possession of the north east quarter of said half section of land, and the defendant Heifner in possession of the south east quarter. The plaintiffs remitted the damages assessed by the jury, and the court rendered judgment in their favor, that they recover of said defendants the land in their declaration mentioned, and the costs of suit.

During the trial a bill of exceptions was taken, which shows, that Sally Ladiga was a Creek Indian, and had been enrolled as one of that tribe by the agent of the General Government, under the treaty of March 24, 1832; that she resided on the land in controversy, both before and after that treaty, and had a cabin upon it, and also a field; that she had no husband living at the date of the treaty, but that she had raised a family of children, all of whom had married and settled off to themselves; that the only persons who resided with her were, an Indian woman named Letter and

her child, and also a boy named Ar-chee-chee; that Sally claimed this boy as her grand-son, and there was proof tending to show that he was such, and that his parents were dead. The proof also tended to show, that Ar-chee-chee resided with Sally, both before and after the treaty; but there was a conflict in the evidence, as to whether he was related to her or not. The Indian woman Letter was not related to Sally, but lived with her, and cultivated her field for her; and it further appeared, that Letter had been located under the treaty as "the head of a family," upon a half section of land.

The testimony also showed, that Sally Ladiga applied to the locating agents of the Government, and claimed to be located as "the head of a family," on the half section of land in controversy; but her application was refused, on the ground that she was not "the head of a family." Her first application was made to M. M. Houston, a locating agent, who testified in this cause, that he determined upon evidence satisfactory to him that she was not entitled to a half section of land, as the head of a family under the treaty. After failing in her application to Houston, she applied to other locating agents, all of whom rejected her claim. She continued, however, to reside upon the land, until 1833 or 1834, when, in consequence of some difficulty that arose between her and one Smith, who, it appears, entered upon the land, and opened a field including her cabin and field, she left the place, and went to reside with a relative. Some time, however, in 1838, she was found by a soldier of the United States army, occupying a shelter upon or near the land, and was carried by him to an emigrating company about to start west, and then at Ross' Landing; and in the fall of that year, she did start with said company to Arkansas, but never reached the west bank of the Mississippi river.

There was also proof tending to show, that some of the white settlers used their influence with Houston, the locating agent, to prevent the allowance of her claim, by representing, and expressing their opinion, that she was not the head of a family; and there was also evidence going to show that the boy Archeechee was not related to her; that on one occasion, she represented the Indian woman Letter to be a part of her family, although she was not related to her, and had herself

been located on a half section of land as the head of a family; that she had also presented to the agent her children, as parts of her family, although they were married, and settled off to themselves; and that the boy Archeechee and the Indian woman and her child were the only persons living with Sally at the date of the treaty.

There was also a conflict in the evidence, as to the manner in which Sally came to the camp of the emigrating company, some of it going to show that she joined the company willingly and of her own accord; this proof was introduced by the defendants. It was proved by one Goodwyn, a witness introduced by the plaintiffs, that in March, 1832, Sally bought some clothes from him for the boy Archeechee, and told witness that he was the same boy witness had seen with her once before in the year 1831.' The defendants objected to this testimony of Goodwyn's; but their objection was over-ruled, and they excepted.

There were also several other objections made to parts of the evidence introduced, which were overruled; but it is not thought necessary to state them.

The defendants introduced, as evidence of their title to the land, two patents from the President of the United States, which show, that the half section of land in controversy had been selected and sold, under the provisions of the treaty, for the benefit of the orphan children of the Creek tribe. The patent for the north east quarter section was issued to Rowland, and the patent for the south east quarter to Heif-ner; and the proof showed, that each defendant occupied the quarter section which had been granted to him.

Upon this state of proof, the bill of exceptions recites, that "among other things, the court charged the jury as follows: That if each of the defendants was in possession of a different quarter section of the half section of land in controversy, and each claimed title to the quarter section in his possession, and there was no connection between the possession or title of the two defendants; and if they find that Sally Ladiga was entitled to the land, as a reservation under the Creek treaty of 1832, they must return a verdict for the possession of each quarter section separately, against the defendant in possession of the same."

The defendants asked the court to charge the jury:

1. That if they believed from the evidence, that defendants Rowland and Heifner owned and possessed different quarters of the half section of land in controversy, and that Rowland never owned, possessed, or had any connection with the possession of the south east quarter, nor Heifner with the north east quarter of the land sued for, they must find for the defendants;

2. That if they believed from the evidence, that defendants owned and possessed different quarters of the half section of land in controversy, and that Rowland never owned, possessed, or had any connection with the possession of the south east quarter, nor Heifner with the north east quarter, then plaintiffs are entitled to a verdict against only one of the defendants, and that must be for the quarter section which such defendant possessed at the commencement of the suit;

3. That if they believed from the evidence, that Rowland and Heifner owned and possessed different quarter sections of the half section of land in controversy; that Rowland never owned, possessed, or had any connection with the possession of the south east quarter, nor Heifner with the north east quarter, then plaintiffs can have a judgment against but one of the defendants, and that must be for the quarter section which such defendant possessed at the commencement of the suit; and the plaintiffs must elect against which one they will proceed for a verdict, and if they do not make such election, then the jury must find for the defendants."

The court refused each one of these three charges, and the defendants excepted to each refusal.

The court charged the jury: "That Heifner and Rowland, as purchasers from the General Government of the United States, could not occupy a more favorable position in this controversy, than the Government itself; that if Houston and the other locating agents, officers of the General Government, refused to locate Sally Ladiga, and rejected her claim, when she applied for the location, then it would not lie in the mouth of the General Government to say, that Sally Ladiga had abandoned her claim to a reservation under the treaty; and that consequently the defendants could not be heard to say, that she had abandoned the land."

Further: "That if it appeared from the evidence, that Houston rejected the claim of Sally Ladiga, after investigation, upon the ground that she was not the head of a Creek family under the treaty, although it may have been shown in such investigation that she had a grand-son, an orphan, living with her, in her house, at and before the date of the treaty, such rejection was entitled to no consideration against the plaintiff's demand in this suit; but if, on the contrary, it appeared that he rejected her claim as the head of a family because it was shown in such investigation that she had no child or grand-child living with her at the date aforesaid, then said rejection was a fact entitled to much consideration, against the plaintiffs and in favor of the defendants;" to the former part of which last charge the defendants excepted.

The plaintiffs in error now assign sixteen errors in the record of the proceedings in the court below, embracing every thing to which exception was taken, in the change of venue, the revivor of the suit, the admission of evidence, the charges given and refused, and the rendition of final judgment. These different assignments of error will be readily understood from the foregoing statement of facts and the brief of the counsel for plaintiffs in error.

S. F. RICE, A. J. WALKER and J. B. MARTIN, for plaintiffs in error :

1. In the action of ejectment or trespass to try titles, the general issue alone is to be pleaded; and under it (as under the general issue in assumpsit,) any thing may be given in evidence, which in law can defeat a recovery in favor of the plaintiff. Wood v. Jackson, 8 Wend. 9, 40. Jackson v. Rowland, 6 Wend 666.

2. It is good in abatement or *in bar*, that the plaintiff was dead at the commencement of the suit. Jenks v. Edwards, 6 Ala. 143.

3. It was erroneous to order the revival of the suit until it was shown *affirmatively* by plaintiffs that Sally Ladiga was alive at the commencement of the suit. And it was also erroneous to give the charges which were given; one of which, at least, asserted plaintiff's right to recover, without referring to the jury the question, whether she was dead at

the commencement of the suit, although it is expressly stated in the bill of exceptions that there was a *conflict* on this and every other branch of the evidence.

4. All proceedings in a suit at law are stopped by the death of the *sole plaintiff*. The order for the change of venue is utterly void, because it was made after the death of the sole plaintiff. Mansony et al. v. Bank, 4 Ala. Rep. 751.

5. The order for change of venue is void for another reason, to-wit: that the Circuit Court of Benton did not intend its final judgment rendered on verdict at its spring term, 1846, should be set aside or its force arrested unless the costs should be paid by the 1st day of August, as a *condition precedent*. The Circuit Court of Benton did not, by implication or otherwise, reserve control of said judgment beyond the 1st day of August, 1846, and *it could not act upon it after* that time. Edwards v. Lewis, 18 Ala. Rep. 496; Lands v. McClellan, 6 Cowen 582; Noland v. Locke, 16 Ala. Rep. 52; Walker v. Hale, 16 Ala. Rep. 26; Stephens v. Broadnax, 5 Ala. Rep. 258; Crothers v. Ross, 5 Ala. Rep. 800.

6. The failure of the plaintiff to have any action whatever taken by the Benton court in the case at its fall term, 1846, was a discontinuance of the cause or abandonment or waiver of the *conditional offer* of the new trial; and this view is strengthened by the entry at the spring term, 1847, which does not even pretend that the clerk or the court had omitted any duty—thus proving that the only default was the default of the plaintiff. The Circuit Court of Benton had no power to act in the case at *spring term*, 1847, even under the decision of Reese v. Billing, 9 Ala. Rep., where the party complied with the offer for the new trial at the *next succeeding term* according to the terms of the offer and within proper time. Suppose, however, that Billing had failed to comply at the *next succeeding* term after the order, and had waited until the *second term*, (as the plaintiff here did) it is clear the decision would have been different. The order at spring term, 1847, treats the order of spring term, 1846, as *inoperative* as to the change of venue, and orders a change of venue *de novo* upon a *new* application therefor by plaintiff. If inoperative as to *the change of venue*, it could only be so by the default of plaintiff or her refusal to accept and comply with *the condition pre-*

*cedent,* and this would render that order of spring term, 1846, void and inoperative *in toto*—as to new trial as well as change of venue.

7. The venue in such an action as this, is *local.* And the Circuit Court of *St. Clair* county could not have or exercise jurisdiction except by a regular and valid order for the change of venue. Clay's Dig. 342, § 162; ib. 343, § 167; Boynton v. Foster, 7 Metc. Rep. 415. Whenever the action of a court is *void,* no exception need be taken. 16 Ala. Rep. 730; 13 Ala. Rep. 529.

8. In this and all other cases in which the Government acts through the medium of agents, the power exists and may be rightfully exercised, to examine and ascertain, if the prerequisites of the law have been complied with. Rosser v. Bradford, 9 Porter 358.

9. Inasmuch as this suit was commenced long after five years had elapsed from the date of the treaty of March, 1832, and by an Indian to whom no patent has ever issued, such Indian cannot lawfully recover without proving both the following propositions, to-wit: I. That such Indian "at the end of five years" from the treaty was "entitled" to the selection; and II. That "*at the end of the five years,*" such Indian was "*desirous*" of "*remaining*" in the country. 15 Ala. Rep. 531; 13 Ala. Rep. 801. See Edwards v. Lewis, 18 Ala. Rep. 495, as to estates to arise on a condition precedent. And even if *she* desired to *remain* in the country, still if her *children and grand children* had no such desire, but voluntarily removed from it and never have returned, *they* cannot recover. The condition of *remaining* in the country applies to *them* as well as to *her.* 13 Ala. Rep. 800.

10. The desire to recover the land, is different from the *desire to remain in the country.* The bringing of a suit more than six years after the treaty, is by no means conclusive proof of a desire to *remain in the country;* especially when the proof also shows that the suit was probably brought after the death of the plaintiff, and has been vigorously prosecuted for at least ten years after her death in her name, through all the courts and the venue changed, before any offer to revive, and when it is shown also that within the five years after the treaty she sold the land to Gooden & Green, and that *since*

*her death* she has given security for costs in two Circuit Courts
(Benton and St. Clair). If she had *desired to remain in the
country*, that desire could have been made known or mani-
fested very satisfactorily between the lapse of the five years
from the treaty and her removal to the west—a period of
more than *one year and five months*. It was essential to her
right that she should have made it manifest *within the period
elapsing* between the expiration of the first five years of the
treaty and her removal to the west (or the beginning of this
suit). She had *no right to sue after the lapse of the first five
years* from the treaty, *until* she did manifest such desire. Yet
there is not a particle of evidence of such manifestation of
desire, after the lapse of five years from the treaty ! And it
was after the lapse of these five years, that Congress passed
an act, which in part or in whole constituted the authority
under which the defendants afterwards purchased and pro-
cured patents. The argument for defendant in error *assumes*
that because Sally Ladiga was not in actual possession of the
land, it was impossible for her, during seventeen months, to
make known in any way her desire to *remain in the country ! ! !*

11. The fact that she sold the land to Gooden & Green, as
offered in evidence, was admissible (although the sale might
have been void) for the purpose of showing that she had no
*motive* to remain in the country—no intention to remain—and
also for the purpose of affecting *the credit* of Gooden (a wit-
ness for her). Cromelin v. Minter, 9 Ala. Rep. 601 ; John-
son v. The State, 17 Ala. Rep. 618.

12. The charge of the court is erroneous, because it with-
drew from the consideration of the jury the following impor-
tant questions of fact, as to which there was a conflict of
evidence and the burden of proof on the plaintiffs, to-wit:
I. Whether or not "*at the end* of five years" from the treaty,
Sally Ladiga made known her desire to remain in the country :
II. Whether or not Sally Ladiga was not dead at the com-
mencement of this suit ; III. Whether or not the present
plaintiffs were *the heirs* of Sally Ladiga. Hall v. Heirs of
Wilson, 14 Ala. Rep. 295. IV. Whether since her death her
heirs *have manifested* a desire to remain in the country. Wells
v. Thompson, Ala. Rep. 800. (The heirs were not *forced* out
of the country.) V. Whether Sally (although "entitled"

*during the five years*) was entitled "*at the end of five years*" from the treaty.

The charge of the court is also erroneous in holding the Government and the defendants *estopped* by the refusal of the locating agents to locate and the rejection of her claim "*when she applied for the location,*" (that is, in 1832, 1833 or 1834, and *within the first five years* after the treaty), from proving that Sally "at the end of the five years" did abandon the land or was not desirous of remaining in the country!!! This was no *estoppel*, Inge v. Murphy, 10 Ala. Rep. 885, and it is very clear that if the question had been left to the jury untrammelled by the *supposed estoppel*, they would have found that she did abandon the land or that "at the end of five years" she was not desirous of remaining; for the proof is distinct that she left the land without any Government force or interference, voluntarily, "*in 1834, and went* to Ball Play creek and *never returned* upon said *land;*" that she had previously sold the land to Gooden & Green and given her *bond for title;* that she remained in the country until "the fall of 1838," (a period of some *four years* after she had voluntarily left the land,) when she with the remainder of the Indian tribe removed west. She had abandoned the land and lost all right or title or just claim to it *long before her removal to the west with the Indian tribe*—by her conduct and omission to make known her desire of remaining in the country "*at the end of five years*" from the treaty or within a short time thereafter—when she was free from force of every description and had full opportunity to make known such desire. The error of a charge withholding any material question of fact from the consideration of the jury, is not cured, although the record contains evidence which seems to make out the fact so withheld from the consideration of the jury. The reason is, that neither the Circuit nor Supreme Court can *weigh evidence* in such case. Gilliam v. Moore, 10 Smedes and Marsh, 138.

13. The phrase "*head* of a *family*" necessarily implies at least *two persons*, between whom there is *dependancy.* Allen v. Mannassee, 4 Ala. Rep. 554.

Of course, where there are only *two persons* in the family and one of them dies the family relation is dissolved, and there is then no "*head* of a family"—"no head"—no "family."

14. Where illegal or irrelevant evidence on any point is admitted, the error of such admission is not cured, although the legal evidence on the same point seems to have been sufficient to prove the point; because the appellate court cannot tell whether the jury based their finding on the legal or illegal evidence or on both together, and also because the appellate court cannot weigh evidence. Whitman v. Bank, 8 Poter, 258; 10 Smedes and Marsh, 130–38 *supra.*

15. It is the duty of the Circuit Court always to protect the jury from the admission of *irrelevant* or any other *incompetent testimony.* Mardis v. Shackelford, 4 Ala. Rep. 501.

This duty cannot be evaded by the court or transferred to the jury, by leaving it to them to say *what weight* they will give to the irrelevant or incompetent proof. The court must primarily decide upon its "ADMISSIBILITY;" and whenever *irrelevant or any other kind* of *incompetent* evidence is admitted, it is a *fatal error*, wherever "the illegal is not withdrawn, or the jury are not explicitly instructed to *disregard it*," (*not to weigh it at all.*) DeGraffenreid v. Thomas, Ala. Rep. 681.

"Illegal or improper evidence ought never to be confided to the jury, however unimportant it may be to the cause." Brown et al. v. May, 1 Munford, 288.

16. Although Sally Ladiga might have been "entitled" to the land, yet the *present plaintiffs* below cannot recover without *proving* to the jury that they had *the legal title* and that they were the heirs of Sally Ladiga. The general issue put in issue the *legal title* and the fact whether the present plaintiffs below were the heirs of Sally Ladiga. Hall v. Heirs of Wilson, 14 Ala. Rep. 295.

17. It was error to admit "the common reputation amongst the Indians of the Creek tribe" to prove that the plaintiffs "were the children and grand children of Sally Ladiga." White v. Strother, 11 Ala. Rep. 720; Blann v. Beall, 5 Ala. Rep. 357.

18. The evidence is clear beyond dispute, that the *present plaintiffs below* cannot recover, even if it were conceded that *Sally Ladiga could have recovered.* They removed *voluntarily* from this country, and although Sally Ladiga has been dead some *thirteen years*, they have *never returned* or indicated any

*intention to return.* They cannot have the land, after this voluntary removal and voluntary remaining out of the country, and without any intention of remaining in this country. 13 Ala. Rep. 800; 9 Ala. Rep. 601; Edwards v. Lewis, 18 Ala. Rep. 495, and authorities cited there as to estates to arise on condition precedent; Pope et al. v. Hamner, 5 Ala R. 433.

The first affirmative charge given, is wholly irreconcileable with this view; because it asserts distinctly that the present plaintiffs were entitled *to recover* if the jury found that *"Sally Ladiga* was entitled to the land as a reservation under the Creek treaty of 1832." This charge relieved the plaintiffs from the proof that Sally Ladiga was "entitled" "*at the end of five years,*" and from the proof of other *essential matters,* and is *affirmative,* and must work a reversal.

WHITE & PARSONS, and JOHN T. MORGAN, for defendants.

1. The Act of January 16th, 1832, Aiken's Digest, 1st edition, page 225, § 18, extended to the Creek tribe of Indians all the statute laws of Alabama, with certain exceptions, and, as a necessary concomitant, the rules of the common law, as applicable to our institutions and the genius of our government, were also extended to said tribe. This was before the treaty of March 24th, 1832, which, when adopted and certified, became the supreme law of the land. Wall v. Williams, 11 Ala. Rep. 826.

2. There is nothing in the treaty which in any manner alters the laws of descent, made applicable to the Indians by the Act of 26th January, 1832; and any estate, real or personal, which the heirs at law of a Creek Indian would have been entitled to before the treaty, they would be at least equally entitled to after the treaty.

3. Before the treaty, according to the case of Chinnubbee v. Nicks, (3 Porter, 362,) the right of occupancy, to no part of the territory, could be sold by any individual of the Creek tribe of Indians. It is not necessary to a correct decision of this case, to dispute the *dictum* mentioned, but the observation of the court in that case was evidently made without at all considering the 14th section of the Act of 1836. Aikens' Digest, 225, § 25.

The decision was evidently based upon the authority of

United States v. Clarke, 9 Peters, 168, and other cases there referred to, but those decisions did not touch upon the question, whether the general principle stated should not be controlled by legislation in the States where those tribes were situated. In Worcester v. The State of Georgia, 6 Peters, 580, the right of the States to legislate for tribes of Indians who had lost the power of self-government, and were surrounded by whites, was clearly admitted, but that case turned upon the treaty stipulations between the Cherokees and the United States. The legislature of the State of Alabama, *before the treaty* of 1833, at Washington, for the Creek tribe of Indians, must be presumed to have rested upon the ground stated in the case in 6 Peters, 580. The argument is conclusive, when the terms of the after made treaty are looked to. The treaty does not secure to the Indians any law-making powers in said territory, but excludes the idea, by a direct guarantee of the exclusive right to legislate for themselves, west of the Mississippi. The nationality of the tribe was destroyed, until they should emigrate west of the Mississippi. The twelfth article of the treaty regards the Indians then in this territory as a part only of the nation. The twelfth article provides a fund to defray the expenses of such Indians as before that time had emigrated.

4. These citations are conclusive to show the power of the State Legislature before the treaty to extend its jurisdiction over the Creek territory and the Creek tribe.

The reservation of ninety sections to the principal chiefs, was evidently intended to embrace also a reservation made to *friendly chiefs*, in the first article of the Treaty of Capitulation, made August 9, 1814. U. S. Statutes, 7, page, 120. That article granted the lands to the chiefs *and their descendants,* and no provision has been made by subsequent treaty, or by Congress, to give patents to the friendly chiefs provided for in the treaty at Fort Jackson. The provisions of that treaty were carried out in the treaty of Washington, and not abridged in any manner.

5. The subsequent legislation of Congress, on the treaty of 1832, (Statutes at Large, vol. 5, 186,) shows that Congress respects the rights of inheritance of the descendants of Creek Indians, and confirms sales made by them of lands belonging to the deceased reservee.

The whole power of legislation in relation to said lands is in the hands of Congress, subject to the restrictions of the treaty and the rights vested under the treaty; and the laws passed by Congress are not merely legislative construction, but stand in the light of an admission on the part of the government, that the descendants of Indians are entitled to the land.

6. The decisions of our court upon the treaty of 1832, necessarily settle the law in relation to the hereditable quality of the estate in the hands of the reservee. In Chinnubbee v. Nicks, 3 Porter, 366, the court define the title to be a *defeasible fee*, a *qualified fee*, and the decision is distinctly rested on the ground that Chinnubbee had made an appointment, and *thereby* defeated his wife's right of dower, which otherwise would have been perfect at his death. In that case the court say that the President's approval *was no part of the contract* of sale, and that it was merely an opinion of the President that the contract was good. Still, it was no contract without approval by the President. *Chinnubbee died before the approval.* If the land, on the death of Chinnubbee, *escheated or reverted to the government,* the President's approval would have been more than *a mere opinion;* it would have been the only act, in relation to the sale, which could have been of any validity.

The opinion in Chinnubbee v. Nicks is approved in Ladiga v. Rowland, 2 How. U. S. Rep.

In Fipps v. McGehee, 5 Port. 432, the title is called an "inchoate *legal* title—the right of entry upon the land, and the right to resort to courts to assert the right. In Jones and Parsons' heirs v. Inge and Murdis heirs, 5 Porter, 332, the court say, the right of the reservee was a *legal estate vested in the Indian, and could be by him enforced in a court of law.*" In this case, page 334. the case of Chinnubbe v. Nicks is approved and its meaning defined. The court did not decide that the reservee had no *legal title.*

7. In Wells v. Thompson, 13 Ala. Rep. 530, the court recognize the rights of the heirs of the Indians to the land of deceased reservee, and classify the title as a "*defeasible fee,*" defeasible "*on the not happening of a certain event,*" to wit, the *manifestation of a desire* on the part of the reservee or his

heirs, to remain upon the land, within the five years. Ladiga manifested her desire, by suing for the land; and her heirs, by continuing the suit after five years elapsed. The government, by its patent, put the plaintiffs in error in possession of the land, and prevented Ladiga or her heirs from acquiring the title. Can the government be heard, to say, "you have not manifested a desire to stay on the land," after making such manifestation simply a vain act! But Wells v. Thompson is not in point. That was a suit brought *after five years had elapsed*, by persons who had done nothing to signify a desire to occupy the land, and were not in the country when the treaty was made. That case *turned upon the curtesy of the husband.* How could he have curtesy in lands to which his wife only had a life estate? 2 Black. Com. 98, (125).

8. The idea, so frequently advanced, that on the abandonment, by the reservee, or on his omission to signify his intention to take a patent for the lands assigned to him, *the land reverts* to the government, cannot be extended to the heirs of the reservee, where the reservee did no act to work a forfeiture in his life-time. There is no true idea of a reversion in the treaty, or arising ,from it; the idea upon which government succeeds to the entire estate is *by forfeiture, not by reversion.* It is a paradox, to say that the owner of the fee becomes a reversioner, when he grants no estate out of himself, but only agrees to grant an estate, upon conditions. There is *no provision in the treaty* for either a reversion or a forfeiture; it is all a matter of construction. At common law, every intendment is made in favor of the heir at law, and he is not to be disinherited, except by a plain intention. 1st Durnford & East, 109; 1 Black. Com. 371, and note 6.

9. The estate of the Indian reservee is very nearly assimilated to an estate upon special trust, to be conveyed to the *cestui que trust* or his assignee upon conditions annexed to the estate, and the title of the government resembles very closely the ultimate fee which enured to the Crown, under the Feudal System. The law is well settled, that estates do not escheat or revert (synonymous terms) to the Crown, where there are heirs at law, or even, in a trust estate, where there are no heirs at law, but a trustee. Greenleaf's Cruise, vol. 3, p. 194, tit. xx, Escheat, § 2, *et seq.*, to page 208-9.

10. By the treaty, it was the design of both contracting powers, to secure *to every class of Indians*, the benefits of the same; head chiefs, orphans, heads of families, and those who had emigrated. If the land was forfeited by the death of the head of the family, the family would be unprovided for. Congress, in construing the treaty, asserts the rights of the widow and children of the reservee to dispose of the land.

11. If a woman had lost her husband and children, before the treaty, she would be unprovided for, unless she were the head of a family; but she would be a head of a family, under the terms of the second article of the treaty, which makes the reservation *for the use of the reservee*, not of the family. The term "head of a Creek family," is a *descriptio personæ*, and is not to be construed according to the rules of construction applicable to our statutes of exception from execution. Those statutes are intended to secure property *for the use of the family*, and the term family is not a *descriptio personæ*, but a term denoting a class of persons. Suppose a Creek man with children married a Creek woman with children by another husband, and they were living together at the date of the treaty, would not both of them take reservations? It will not do to say that this was a *casus omissus* in making the contract; such would not be a fair interpretation of it. By the treaties, from first to last, the Creeks put themselves under the *guardianship* of the government; and the President is called their *great father*. Shall the guardian, by a narrow construction, rob his ward of a whole territory, and then of the promised consideration upon which the cession was made? See Statutes at Large, vol. 7, p. 35; Cherokee Nation v. Georgia, 5 Peters, 1.

12. If these positions be true, there was no error in admitting evidence of Ladiga's acts and declarations about her grand-child, for which the court would reverse, for there was no injury. The proof was clear, independent of that proof, that she was the head of a family.

13. As to the competency of John Gooden, these cases are conclusive. 5 Porter, 503; 5 P. 161; 18 Ala. Rep. 196; 18 Ala. Rep. 118.

14. The demurrers to the pleas were well sustained. The general issue had been pleaded jointly, and the case tried

upon it, and the court should have rejected the pleas; but if not rejected, the pleas were bad. 3 Bibb, 314; 2 Stew. 356; 3 Rand.; 12 Serg. & Rawle, 435; 3 Bibb, 180; 8 Watts, 356; 9 Dana, 452; 3 B. Munroe, 176; 21 Wend. 598.

15. The proof of Sally's declarations made to Goodwin were competent as a part of the *res gestæ*, or control of the boy. See Phillips' Ev. Cow. & H., notes.

16. The new trial, at Spring Term, 1846, was granted on payment of all costs by plaintiff, " on or before the 1st day of August following." This would seem to bring the order within the rule which is hinted at by this court in Edwards v. Lewis, 18 Ala. Rep.; but at the same time, and in the same entry, follows an order for a change of venue In relation to *this* the entry says, "if the cost is not paid by the first of August, *a change of venue is denied*." Is it not, therefore, apparent, the court did not intend to make the new trial depend on the payment of costs as a condition precedent?

17. But it is said *Sally was dead* at the time this order was obtained. The record does not show this fact. We find, "that in the fall of 1838, she started with the emigrating company of Indians, and never reached the west bank of the Mississippi river." If inferences are to be drawn, they will be in favor of the record, and not against it. Indeed, every *intendment* is in favor of record, which is not expressly negatived by the facts set forth in the record.

Again, it said " a party complaining of error must set out in the record so much of the evidence as is necessary to show it *affirmatively*." Brazier & Co. v. Burt, 18 Ala. Rep. 201.

No exception was taken in the Circuit Court of Benton County, to the action of that court in changing the venue; but we find the defendants objecting in the Circuit Court of St. Clair to the record or transcript and papers being filed in that court. This objection not only came too late, but was made in the wrong forum.

18. The cause was revived in the name of the heirs of Sally. The Court determined who were the heirs, and no exception was taken to this mode of trial; therefore this court will not review that question. Doe ex dem. Ethridge v. Malempre, 18 Ala. Rep. 571.

19. The judgment entry of Spring Term, 1849, shows that

Rowland and Heifner v. Ladiga's Heirs.

defendants went to trial on a joint plea of "not guilty," and also several pleas of "not guilty." They also plead specially, as appears by the return to the certiorari.

The verdict finds each defendant in possession of a separate portion of the land, viz., Rowland of the north-east quarter, and Heifner of the south-east quarter, and separate writs of possession are adjudged as to each. We insist that this is in strict accordance with the well settled practice—these parties being trespassers on the lands of the plaintiffs; and this has been the practice in actions of ejectment for a hundred years. Jackson ex dem. Haynes v. Wood, and cases cited, 5 John. 278; Roman v. Sidney, 12 ib. 185; Smith v. Shackelford, 9 Dana, 452. In Camden v. Haskell, 3 Randolph, 466, the court say "the proposition insisted on is negatived by the *uniform practice and all the authorities*," and refer to Buller's Nisi Prius, 98, and Adams on Ejectment; 21 Wend. 598; 12 Serg. & Rawle, 435.

DARGAN, C. J.—We will not examine in detail every question that has been presented in the course of the argument, but only such as are material to the merits of the cause, as it is presented to us by the record.

When this case was before the Supreme Court of the United States, the facts material to the right or title of Sally Ladiga were in substance the same, as they now appear from the record before us; and that court held, that a grandmother of the Creek tribe of Indians, with whom her grandchildren resided, was the head of a family, within the meaning of the second article of the treaty concluded on the 24th day of March, 1832, between the United States and the Creek tribe East of the Mississippi River.

It was also held, that, as Sally Ladiga resided on the half section of land in controversy, and selected it as her reservation, and made application to the agent of the Government to be located upon it, the refusal of the locating agent to recognize her right upon the ground that she was not the head of a family, did not in any manner affect her title derived under the treaty. It was also held, that, as she had made application to be located on the land, and her application being refused and she afterwards being removed from the country

by the military force of the government, she had not abandoned the land, nor lost her title thereto derived from the treaty, and consequently that her title was superior to the title of the defendants, which is derived under the same article of the treaty which authorizes the President to select twenty sections of land for the benefit of the orphan children of the Creek tribe, to be divided amongst them or to be sold for their benefit as the President might direct. See 2 Howard R. 581. This decision, the effect of which we have stated, is conclusive to show that the title of Sally Ladiga, so long at least as she was in life, must prevail over the title of the defendants; and we yield to it, not only as authority binding upon us, but as a correct exposition of the treaty.

But as she has departed this life since the institution of this suit, the question arises, whether she had such an estate as would descend to her heirs at law, who had removed west of the Mississippi with their tribe.

Before the treaty the ultimate fee simple to the land was vested in the General Government. This at least was the policy adopted by our Government in reference to the Indian lands. The Indians were allowed the right of possession, but not the right of disposition—that right, or the ultimate fee, was claimed by the Government of the United States. The Indians however had an interest in the soil, and that interest was the right to occupy and enjoy, and the Government of the United States has never assumed to deprive them of that right, except by contract founded on sufficient consideration. And in the treaty of the 24th March, 1832, it was part of the consideration, moving from the General Government to the Creek tribe, *that each head of a Creek family should be entitled* to a half section of land, to be selected by him or her so as to include his or her improvement, if the selection could be so made. The second article of the treaty, which conferred this right on the heads of families, also provides, that the tracts thus selected should be *reserved from sale for their use for the term of five years,* unless sooner disposed of by those entitled to them. The third article stipulates, that these tracts of land, thus selected by the heads of families, may be conveyed by the persons selecting the same for a fair consideration, in such manner as the President may direct, but that the

contract should not be valid until it had received the sanction of the President. The fourth article provides, that at the end of five years all the Creeks entitled to these selections and desirous of remaining shall receive patents therefor, in fee simple, from the United States.

If we were to admit that, under these articles, an Indian reservee would forfeit his title to the land allotted to him, by abandoning the possession and removing from the country within the five years, as was indicated in the case of Wells v. Thompson, 13 Ala. 793; still, I think it clear, that if the Indian reservee took possession of the land allotted to him, and neither sold it, according to the provisions of the third article of the treaty, nor abandoned it by leaving the country within that time, then he became entitled to a patent, and was vested with the fee simple title.

The fourth article of the treaty, it is true, provides, that at the end of five years, all the Creeks entitled to these selections and desirous of remaining, shall receive patents therefor in fee simple. But there is no provision made in the treaty prescribing the mode in which the desire of the Indian reservee shall be made known to the Government, nor is any time prescribed after the expiration of the five years, within which he should make his wish or desire known, but he becomes entitled to a patent at the expiration of five years, if he is desirous of remaining in the country. This desire, I think, is sufficiently indicated by his failure to sell within five years, and his remaining upon the land allotted him without abandonment. An Indian reservee who had not sold, but had remained upon his reservation, would have performed the condition upon which he was to receive a fee simple title to the land allotted to him, and he would hold it to himself and to his heirs forever, as any other tenant in fee; and consequently upon his death the land would descend to his heirs at law, who could even before the issuance of the patent bring ejectment. This view may not be entirely consistent with the case of Wells v. Thompson, *supra*, or rather with the reasoning employed in that case, but I hold it to be in accordance with the plain meaning of the treaty; for at the very moment of the expiration of the five years, the Indian became entitled to a patent in fee simple, for then the condition sub-

sequent annexed to the grant was performed, provided he had neither sold nor abandoned the land. The head of a Creek family, therefore, took a title under the treaty defeasible upon the condition that he either sold or abandoned the land within five years. If he had done neither within that period, that is, if he neither sold it according to the provisions of the third article, nor abandoned the land, his title then became absolute and indefeasible, and of course descended to his heirs.

We have seen from the decision of the Supreme Court of the United States, made in this case, that Sally Ladiga became entitled to the land in controversy, by virtue of the treaty, as the head of a family, and it is certain that she has not sold her right according to the provisions of the third article of the treaty. Nor did she abandon the land; on the contrary, she repeated her application before several locating agents, all of whom rejected it, and although she removed from it in consequence of some difficulty between her and one Smith, who it seems surrounded her cabin by a field opened by him, yet she was found in a shelter upon or near the land, by a soldier of the United States, and was carried by him to a company then about to emigrate west. She was neither asked nor consulted whether she wished to abandon the land or not, but, so far as we can discover, was removed without any regard to her wishes, and this too, after the expiration of the five years. In no just sense can it be said that she abandoned it, which implies a voluntary act. She removed from the land in consequence of the unlawful act of an intruder, and was then removed from the country by the Government, without any inquiry whether she desired to remain on the land or not. To hold this to be a voluntary abandonment of the land, within the meaning of that term which would work a forfeiture of her title, would, in my judgment, be a stain upon our Government. It would in effect be, to allow lawless force to defeat individual rights. But it would have sufficed to have said, that the Supreme Court of the United States have decided that she had not abandoned the land, and consequently was still invested with the title, notwithstanding her removal from the country, and therefore her title of necessity must have descended to her heirs; for not having sold the land, and not having abandoned it within five years, her estate became absolute

and indefeasible, and her heirs at law may maintain ejectment upon her title.

It is however urged, that the court erred in the admission of evidence introduced by the plaintiffs to show that Sally Ladiga was the head of a family. Goodwyn, a witness introduced by the plaintiffs, testified that in March, 1832, he sold to Sally Ladiga some clothes for the boy Archechee, and she then told him that it was the same boy he had seen with her in 1831. To the admission of this testimony the defendants excepted.

It must be borne in mind that the objection is to the whole of the testimony, and not to any specific part of it; consequently, if any portion of it was admissible, there was no error in admitting it, for the court is not bound to separate the evidence when the objection is to the whole, and if any part of it be admissible there is no error in refusing to reject it. And I think that, even if what Sally Ladiga said at the time of purchasing the clothes, that Archechee was the same boy that the witness saw with her the year before, was inadmissible, still, it is very certain that the witness might well have testified to the act of selling her clothes for Archechee, for it tended to prove that he was one for whom Sally Ladiga was bound to provide as a member of her family.

It is again insisted, that the court erred in admitting the common rumor amongst the tribe of the Creek Indians, that the plaintiffs were the children and grandchildren of Sally Ladiga. But as this question was raised it cannot be reviewed by this court; for it does not appear from the bill of exceptions that this proof was offered to the jury, but to the court, upon the motion to revive the suit in the name of the plaintiffs as the heirs at law of Sally Ladiga. By our statutes, a party from whom lands are unlawfully withheld, may bring ejectment or trespass to try titles for the recovery thereof at his election. Clay's Digest 320; Jordan v. Abercrombie, 15 Ala. 580. And if the action of trespass to try titles be brought to recover the free-hold, and the plaintiff die pending the suit, the action does not abate, but may be revived in the name of his heirs at law. Jordan v. Abercrombie, *supra;* The State ex rel. Nabors' Heirs, 7 Ala. 459.

Inasmuch as the action may be revived in the name of the heirs, the court may, without violating the law, require some proof of their heirship; but we could not say that it would be error to revive the suit on motion merely, without any proof whatever of the heirship of the plaintiff, for notwithstanding the court might allow the suit to be revived in the names of the plaintiffs, as the heirs at law of the deceased plaintiff, still, upon the trial before the jury, they would have to prove their heirship as part of their title, and if they failed in this they would fail in the suit, although the suit was revived in their names. The proof, therefore, to which the defendants excepted, being introduced to the court as laying a predicate for reviving the suit, is not revisable; and it is therefore immaterial to inquire whether it would have been legitimate evidence to prove the heirship of the plaintiffs before the jury or not; for if the order of revivor had been made without any proof at all, it could not have been an error of which the defendants could have complained; they might still have contested the heirship of the plaintiffs upon the trial.

We however deem it proper to say, that in questions of pedigree the declarations of deceased members of a family have always been received as evidence, to establish the parentage or descent of the particular individual whose relationship is the subject of investigation. Green. Ev. Vol. 1, § 103, and cases there cited; Starkie on Evidence, Vol. 2, 834.

This brings us to the last question we propose to examine, and that is, the first charge contained in the bill of exceptions. The language of that charge is: "that if each of the defendants was in possession of a different quarter section of the half section of land in controversy, and each claimed title to the quarter section in his possession, and there was no connection between the title and possession of the defendants, and if they found that Sally Ladiga was entitled to the land as a reservation to her under the treaty of 1832, they must return a verdict for the possession of each quarter section separately against each defendant." This charge is assailed on two grounds: first, because a joint action cannot be maintained against two defendants, who occupy distinct parts of the land sued for, and between whom there is no connection; and secondly, because this charge assumed that the plaintiffs

were entitled to recover, irrespective of the fact, whether or not they were the heirs at law of Sally Ladiga.

In respect to the first objection, it is sufficient to say, that if land be withheld from one unlawfully by several tenants, they may be all sued in one action, and if they possess distinct parts separately, and not in connection with each other, they may protect themselves against a joint judgment for damages; but the rule is well settled, that the plaintiff is not compelled to sue all separately, for the recovery of the possession, but may sue them jointly and recover of each the portion occupied by him. Jackson *ex dem.* Haynes, *et al.* v. Wood and others, 5 John. 278; Camden et al. v. Haskell, 3 Rand. 462; Adams on Eject. 235.

The second objection to the charge, however, we think is well taken; for if the right of a plaintiff to recover depends on three or more distinct facts, a charge that assumes he may recover if two only be established, must be erroneous. In the case before us, it may be that Sally Ladiga was entitled to the land in controversy as a reservation, and the defendants may have separately occupied distinct portions of it, and still, the plaintiffs could not recover without showing that they were the heirs at law of Sally Ladiga; but this charge, *standing alone*, rendered it unnecessary for the jury to inquire into the question of heirship, and placed the right of the plaintiffs to recover on the two questions, the title of Sally Ladiga, and the possession of the defendants.

It is however urged, that we should presume that in the other instructions given by the court to the jury, and which do not appear in the bill of exceptions, the jury were informed by the court that they must find that the plaintiffs were the heirs at law of Sally Ladiga; especially, as the record informs us that the court, in response to the defendants' inquiry upon the motion to revive the suit, informed them, that they might contest the plaintiffs' heirship upon the trial before the jury.

We are satisfied, that the court as well as the counsel engaged in the cause, knew that it was indispensably necessary to the plaintiffs' right of recovery, to establish their heirship, and it may be, that the jury were in fact so instructed, but the record does not show that they were; it shows that they were charged, that the plaintiffs were entitled to recover, if

Sally Ladiga was entitled to the land as her reservation un-
der the treaty, and if the defendants were in possession of
separate parts of it.   This charge, standing alone, and unex-
plained by other instructions, is erroneous, and the record
does not show what explanation or other instructions tending
to explain it were given.   We therefore cannot say the charge
is not erroneous within itself, and without further instructions
it is erroneous; and in order to take away the error, we must
see the further instructions that were given, and which had
this effect.

For this error, we are constrained to reverse the judgment,
and remand the cause for another trial.

PHELAN, J.—The action was commenced below in the
name of Sally Ladiga; she died, and the suit was revived in
the name of her heirs at law.

In respect to the charge for which the judgment below is
reversed, it is said: here is an affirmative charge which em-
braces but two points of law, when three were necessary to
be stated, to inform the jury fully of the duty which devolved
on the plaintiffs to make good their action.   The court below
charges the law respecting the *title* of Ladiga and the posses-
sion by the defendants, but omits to notice the *heirship* of the
plaintiffs.   The alleged error, then, is not in misdirecting the
jury on the points of law which were noticed, but in omitting
to notice another point altogether.

Now I will ask, does it, in the first place, clearly appear
from the record, that this point was omitted altogether by the
judge below?   And, if omitted, does it, in the second place,
further clearly appear from the record, that such omission
was to the injury of the plaintiffs in error?

I do not think it clear, from the record, that the point as
to the *heirship* of the plaintiffs was wholly omitted in the
charge to the jury.   The bill of exceptions itself discloses
that "*other* charges" were given, besides those set down in
the bill.   The nature of the trial, and the purely formal na-
ture of the point as to *heirship*, (about the law of which there
could hardly be a dispute) lead to the fair presumption, as it
seems to me, that one of these "*other*" charges to which the
bill of exceptions refers, was a charge respecting the *heirship*

of the plaintiffs, and that the reason why it is not set out, or more specifically noticed in the bill, is, that there was no exception taken to it.

In Donnell v. Jones, 17 Ala. Rep. 689, the court say, " When we are called upon to construe a doubtful bill of exceptions, that construction will be adopted which is most favorable to the regularity of the judgment." Indeed, it is a general principle, well established, and, I may say, a favorite one with appellate courts, to indulge all reasonable presumptions and intendments in favor of the regularity of the action of the court below. 14 Ala. Rep. 822; 6 Ala. Rep. 801; 7 Ala. Rep. 19; 3 S. & P. 444.

But even admitting that, with the aid of this favorable rule of construction, we cannot presume that any charge on the point of *heirship* was given, the next question recurs; does it clearly appear from the record, that the omission to charge on that point was to the injury of the plaintiffs in error?

Let it be borne in mind, that the charge does not state any rule of law erroneously; its error is alleged to consist, in omitting to state a certain point altogether. The rule fairly deducible from such a doctrine, I hold to be this: that it is necessary for a judge of the Circuit Court, when he makes an affirmative charge, to state the law which relates to every material allegation of the plaintiff's declaration, or his charge will be erroneous.

Can such a rule be made to consist with the doctrine that the party seeking to reverse must clearly show error, and that all reasonable intendments and presumptions shall be in favor of the regularity of judgments. I do not think it can, as I will endeavor to show.

We know that in almost every proceeding in the inferior courts, there are certain formal matters of fact, which must be proved to entitle the plaintiff to recover, which rarely ever become the subject of controversy. Again : we know that nothing is more common in practice than for a defendant, either to save costs, or for some other good reason, to abandon altogether some legal point in the defence, although such abandonment never appears upon the record.

Now it is undeniable, that in cases where there are such uncontroverted matters of fact or conceded points of law,

charges are continually given by the circuit judges, which, under this rule, would reverse judgments, without the slightest injury having been done to the defendants by the omission to notice them in the charge.

To illustrate my meaning: A plaintiff sues as administrator, and the defendant by plea puts the character in which he sues in issue. At the trial the plaintiff brings his letters into court, proving conclusively his character, and there is not a word of controversy more on that subject from beginning to end, but the case is strongly litigated, on the plea of *non est factum*, for instance. The court charges the jury, and says: "Gentlemen, if you find that the defendant executed this bond, you must find for the plaintiff." The attorney for the defendant says, "I except to that charge," and takes his seat, without saying more. The judge, and probably every body else but himself, has forgotten that he had a plea in that plaintiff was not administrator; the proof upon that point was conclusive; he has made no allusion to that defence in his argument; and if the judge's mind reverts to it at all, he regards it as tacitly abandoned. Does the counsel want a charge upon that point? Not at all; that is the very thing he does not want. To disclose what he wants would defeat his object, which is, to keep a charge that does him no harm in its present frame, that he may reverse the judgment upon it, when he knows that the least allusion to its supposed defect would result in a prompt correction by the court.

This court would be compelled to reverse for error in the charge in the case I put, on the principle established in this case. I will put another case.

A party is indicted for assault and battery. The State does not prove the venue—a merely formal thing. The court says; "Gentlemen, if you find that the defendant struck the prosecutor without provocation, you must find him guilty." The counsel for the defendant says, "I except to that charge, and I ask the court to charge the jury, that it was necessary for the State to prove that this offence was committed in *this county*." "True," says the judge, "that is necessary, but it is a mere formal and technical thing, and I will allow the solicitor to prove that now." Is any injury done to the defendant by this? None. Such a course is perfectly lawful. Here

the counsel, by disclosing the ground of his objection, enables the court in a moment to obviate it, and not only to supply the charge, but the proof to base it upon. What, then, if the counsel had chosen to except, without disclosing the ground of his objection, shall that better his client's condition? In other words, shall a cautious and artful concealment accomplish ends which openness and fairness cannot?

What I now propose, seems to me to furnish the ground for a sound distinction in cases of this sort.

If an affirmative charge touching the *merits of the action*, strictly so called, is correct, such charge should not be held to be erroneous because it does not likewise embrace formal and technical matters, unless it be excepted to in the court below for that reason.

To recover in any action, a plaintiff must first have a good cause of action, and, secondly, he must pursue it in a formal manner, correct according to the rules of law. If a charge covers the first matter, and is correct, the court may stop at that; and if the defendant wants a charge in respect to formal matters, he must ask it, or he ought not to be allowed to object in an appellate court, that such formal matters were not noticed. The trespass on the lands of Sally Ladiga, the *locus in quo*, was the *gravamen* of the declaration, and the *merits of the action* embraced this and the title of Sally Ladiga only; all other things were formal.

It is not every allegation in a declaration necessary to make it good, even upon general demurrer, that embraces the *merits of the action*. Waldrum and Wife v. Quarles, 20 Ala Rep. If a party goes to trial without demurring, he is held to be precluded from assigning as error in an appellate court, many such omissions in the declaration; but if the court below makes an affirmative charge, and does not cover such matters, although not objected to on that account, it is by this decision held to be error. This does not seem to me to be consistent.

Such a rule as I propose would secure to one party every just right, and at the same time prevent the other party from being lulled into a false security by his silence, when he ought to speak out; it will at the same time prevent the circuit judges from the consequences of a cautious and artful silence on the part of counsel.

I close these observations in the language of C. J. Collier, in the case of Crawford v. The Bank, 7 Ala. Rep., 210." "General objections, calculated to entrap the court and the adverse party, should be discountenanced, and when they are not promotive of justice, should be most unfavorably regarded in an appellate court."

I am dealing with a principle, and what I suppose to be its injurious consequences, but, lest it might be supposed that some parts of this opinion are intended to have a personal bearing on the counsel who conducted this cause for the plaintiffs in error in the court below, I take occasion to say, that I intend nothing of the kind. Their conduct was in all respects wholly unexceptionable. It is the consequences of the rule adopted by the court, that I aim to combat, and that alone. The construction that will be given in this court to a bill of exceptions is oftentimes not fully apprehended, either by the counsel who prepares or the judge who signs it.

CHILTON, J., having been of counsel in this cause before his election to the bench, did not sit.