## ROSE *vs.* GRIFFIN.

[REAL ACTION IN NATURE OF EJECTMENT.]

1. *Indian reservations under the treaty of* 1832 *with the Creek Indians.*—Under the treaty of 1832, between the United States and the Creek Indians, the title to all the Creek lands was ceded to the United States, and the reservations to the heads of families were of an estate for five years only, to be enlarged into a fee, at the expiration of that time, on the happening of the contingencies provided for in the treaty. (Overruling *dicta*, to the effect that the reservee took a defeasible fee, in *Wells v. Thompson*, 13 Ala. 793 ; *Corprew v. Arthur*, 15 Ala. 525 ; and *Rowland & Heifner v. Ladiga*, 21 Ala. 9.)

2. *Validity of patent.*—A patent from the United States government, which recites that a Creek Indian " became entitled " to the land under the provisions of the treaty of 1832, and that the land was afterwards sold under the provisions of the act of congress of March 3, 1837, authorizing the sale by the government of unsold reservations, cannot be pronounced void on its face.

APPEAL from the Circuit Court of Coosa.

Tried before the Hon. WILLIAM M. BROOKS.

THIS action was brought by Howell Rose, against Martha M. and Bennett S. Griffin, to recover "the south half of section three, in township nineteen, range nineteen, in the Tallapoosa land-district," together with damages for its detention. The defendants pleaded not guilty, and made the statutory suggestion as to the erection of valuable improvements under adverse possession for three

years. The plaintiff claimed the land under a patent from the United States, dated the 30th June, 1856, signed by the president, and duly executed, which was in these words:

"*The United States of America,*

"To all to whom these presents shall come, greeting:

"Whereas, Co-e-jus-hadjo, one of the Creek tribe of Indians, by virtue of a treaty between the United States and the said Creek tribe of Indians, made the 24th day of March, 1832, became entitled, out of the lands ceded to the United States by the said treaty, to the south half of section three, in township nineteen, of range nineteen, east, in the district of lands subject to sale in Montgomery, Alabama, containing three hundred and nineteen 72-100 acres, according to the official plat of the survey of the said lands returned to the general land-office by the surveyor-general; and whereas, pursuant to the provisions of the act of congress approved March 3, 1837, entitled "An act to authorize and sanction the sales of reserves provided for Creek Indians in the treaty of March 24, 1832, in certain cases, and for other purposes,' the said tract was sold on the 6th day of May, 1856, to Howell Rose, as appears from an official return, dated June 7, 1856, from the office of Indian affairs to the general land-office: Now, know ye, that the United States of America, in consideration of the premises, and in conformity with the provisions of the said act, have given and granted, and by these presents do give and grant, unto the said Howell Rose, and to his heirs, the said tract above described; to have and to hold the same, together with all the rights, privileges, immunities and appurtenances, of whatsoever nature, thereunto belonging, unto the said Howell Rose, and his heirs and assigns forever. In testimony whereof," &c.

The court charged the jury, that this patent "was void on its face, and conferred no title on the plaintiff to the land in controversy;" to which charge the plaintiff excepted, and which he now assigns as error, having been thereby compelled to take a nonsuit.

L. E. PARSONS, for the appellant, made these points:

1. At the time the treaty of 1832 was made, the title to all the Creek lands was in the nation. Each individual had the right to occupy, use and enjoy, but had no title to any separate and distinct portion of the land. By the treaty, the United States acquired the legal title to all the lands, and agreed to allow the principal chiefs and heads of families to make certain selections; which selections, the second article of the treaty provided, "shall be reserved from sale, for their use, for the term of five years, unless sooner disposed of." It was the policy of the United States, and their expressed wish as declared in the treaty, that the Indians should remove to the country west of the Mississippi; but no force or compulsion was to be exercised to effect their removal. In furtherance of this policy, the United States engaged that said selected lands should be reserved from sale for five years, unless sooner disposed of by the Indians themselves. During this period of five years, the United States could not dispose of these reservations; the Indians could, but only in the manner pointed out in the treaty. At the expiration of the five years, if the Indian had not sold, and was desirous of remaining, he had a right to a patent for his reservation in fee-simple.

2. The plaintiff's patent shows, that Co-e-jus-hadjo "became entitled" to the land in controversy under the provisions of the treaty, and that the land was afterwards sold under the provisions of the act of 1837. But there is nothing in the recitals of the patent to show that he was desirous of remaining at the expiration of the five years; and that is the only fact which could interfere with the right of the United States to sell and convey the land. The court will take judicial notice of the fact, that the Creek Indians, as a tribe, did remove west of the Mississippi river, in accordance with the policy declared in the treaty; but it cannot judicially know whether their removal was voluntary or compulsory, which is a doubtful question of fact; nor whether Co-e-jus-hadjo, in determining the question of removal for himself, desired to remain; nor whether he was even alive at that time; nor

whether, if dead, he left heirs on whom his rights, whatever they were, might descend. Unless the court can judicially know that he was alive at the expiration of the five years, and desired to remain, it cannot declare the plaintiff's patent void on its face.

GOLDTHWAITE & SEMPLE, on the same side.—The validity of the patent depends on the question, whether the United States had title to the land at the time it was issued; a question which involves the construction of the treaty with the Creek Indians of March 24, 1832. If the question could be regarded as an open one, we should insist, that the intention of the treaty was to preserve the fee to the lands in the United States, until the issue of a patent after the expiration of five years. This construction is obvious from the language of the instrument itself, the words used being such as repel the idea of grant.—Wilcox v. Jackson, 13 Peters, 498, 516. The provision in the second article, stipulating that the selected lands "shall be reserved from sale" for five years; the provision in the third article, stipulating that a title "shall be given" by the United States in cases of approved sales; and the provision of the fourth article, stipulating that patents in fee-simple shall be issued by the United States, at the expiration of the five years, to those reservees who might desire to remain,—are inconsistent with the idea of a present grant. On this question, see the reasoning of Judge Hopkins, in Chinnubbee v. Nicks, 3 Porter, 362. This question, however, is conclusively settled by the decisions in the cases of Ladiga v. Roland, 2 Howard, 581; Rowland & Heifner v. Ladiga, 21 Ala. 9.

Conceding that the treaty, *per se*, operates by way of grant, the question is as to the character and extent of the grant. For the appellant it is insisted, that the estate taken by the reservee is the use of the land for five years, with a conditional power of sale during that time; which estate is to be enlarged into a fee, at the expiration of the five years, if the land is then unsold, and the reservee is desirous of remaining. The fee does not vest in the reservee, unless and until these conditions are fulfilled or

excused. The grant of the fee is upon condition precedent, expressed in the grant.—3 Bla. Com. 88; 4 Kent's Com. (8th ed.) 124–5. The expression used by the court in the cases of Wells v. Thompson, (13 Ala. 793,) Corprew v. Arthur, (15 Ala. 525,) and Rowland & Heifner v. Ladiga, (21 Ala. 9,) characterizing the estate as "a defeasible fee," or an estate upon condition subsequent, are inaccurate, and amount to nothing more than *dicta*. In each of these cases, the same result would have been attained, whether the condition annexed to the estate was precedent or subsequent.

If the treaty operates as a grant from the United States upon condition precedent, it would devolve on the grantee, in an action by the grantor, to prove the performance of the condition on which his estate was to vest. The plaintiff here succeeds, by virtue of the patent, to all the rights of the grantor, and could recover against the grantee unless performance of the condition is shown; *a fortiori*, may he recover against a stranger.

N. S. GRAHAM, with whom was JNO. T. MORGAN, *contra*. All the treaties between the United States and the Indians, from the year 1790, and all the acts of congress in connection therewith, from the act of May 19, 1796, down to the act of March 3, 1837, under which the plaintiff's patent was issued, in connection with the history of the action of the United States government towards the Creek Indians, conclusively show that the United States, in all the departments of the government, legislative, executive and judicial, have admitted the right of the Indians to attach to the soil, and not to be taken from them without their consent and on valuable consideration. By all the treaties made with the Creeks, prior to that of 1832, the title to the lands was regarded as being in the tribe as a nation, contradistinguished from the idea that any individual of the tribe had any special title to any particular tract; and the United States guarantied the integrity of the territory to the tribe as a nation. The treaty of 1832 made the first clear and distinct advance towards localizing and individualizing the tract of the individual

Indian, as distinguished from the nation in its aggregate capacity. It inaugurated the great feature of civilization and christianity, of giving to individual rights the strong arm of government as a shield against lawless aggression; of identifying the locality of the individual, and associating his name with his place; thus clustering his affections about his corn-patch and hearth-stone, and making his house a castle of defense. This is the great and distinguishing feature of the treaty of 1832.

While it may be conceded that, by the first article of the treaty of 1832, the Creek tribe of Indians ceded all their lands to the United States; yet this cession of the nation as such was upon the express condition, contained in the second article, that the United States engaged to survey the lands as soon as convenient, (thus rendering it capable of being individualized,) and, after the completion of the survey, to allow ninety principal chiefs to select, &c. The first clause is not binding on the Indians, unless the second is binding on the United States; the first does not operate a present grant of the title to the United States, unless the second operates a grant of the reserved lands to the individuals by whom they w're to be selected; for treaties are reciprocal.—Vattel, book 2, p. 214. It is this act of selecting and setting apart from the aggregate territory of the tribe, this isolating, disintegrating process, which individualizes the tract in connection with the reservee; which gives the individual Indian "a title perfect and indefeasible," not only against the Creek nation, but against the United States; which cut him off from the war-path, clothes him with the garments of civilization, lures him from the forests and jungles of the roaming hunter, and leads him quietly into the peaceful pursuits of agriculture and the arts.

"Under the provisions of the treaty with the Creek tribe of Indians on the 24th March, 1832, we hold that the title of the Indian reservee, is a legal title, capable of sustaining an action of ejectment; that being located upon his reserve, and neither selling nor abandoning, his title became perfect and indefeasible, and descended to his heirs."—Rowland & Heifner v. Ladiga, 21 Ala. 9; also,

Rose v. Griffin.

Rowland v. Ladiga, 9 Porter, 491; Jones & Parsons v. Inge & Mardis, 5 Porter, 327; Fipps v. McGehee, 5 Porter, 413; Wilcox v. Jackson, 13 Peters, 498; Stephens v. Westwood, 25 Ala. 719; Marsh v. Brooks, 8 Howard, 232; Johnson v. McIntosh, 8 Wheaton, 574; Ladiga v. Rowland, 2 How. 581; 2 Yerger, 143, 407, ; 8 Yerger, 249.

The plaintiff's patent recites, that " Co-e-jus-hadjo, one of the Creek tribe of Indians, under the provisions of the treaty of March 24, 1832, became entitled " to the land sued for. This recital is an admission that Co-e-jus-hadjo was the head of a family belonging to the tribe, that the land was surveyed by the United States, was selected by him as his location, and that he was located upon it; and thus dispenses with proof of those facts. That the recitals may be looked to for this purpose, see Jones & Parsons v. Inge & Mardis, 5 Porter, 327; McCravey v. Remson, 19 Ala. 436; 4 Peters, 182; 6 Peters, 598, 611; 5 Cowen, 216; 9 Cowen, 86, 128; 4 Binney, 231; 4 Wash. C. C. 691; 10 Mass. 155; 9 Wendell, 209; Rawle on Covenants for Title, 485.

The title being thus shown to have vested in the Indian, the subsequent sale of the land under the provisions of the act of 1837, as recited in the plaintiff's patent, was a mere nullity, and could not operate a divestiture of that title. The Indian's title was perfect under the treaty, without a patent, which could only operate as an admission by the United States that all the provisions of the treaty had been complied with on the part of the Creek nation. The act of congress of 1837, providing for the sale of unsold reservations, is a gross usurpation of authority, contrary to the provisions of the treaty, and therefore void; and the plaintiff's patent, showing on its face that it was issued without authority, and in violation ot treaty rights, is also void.—Minter v. Commelin, 18 How. 87.

WALKER, J.—The great question of this case is, whether the government of the United States had the power to sell the half-sections of land reserved to the heads of families of the Creek tribe of Indians, after the expiration of five years from the ratification of the treaty

of 24th March, 1832, with that tribe. The decision of this question must be governed by the character of the estate which the heads of families took under the treaty in the lands selected by them.

The first article of the treaty is in the following words: "The Creek tribe of Indians cede to the United States all their lands east of the Mississippi river." The words of this article are clear, precise, have an evident meaning, lead to no absurd conclusion, and therefore have no need of interpretation, and it is not allowable to interpret them.—Vattel's Law of Nations, 244. They invest the United States with the title to all the lands east of the Mississippi. There are no subsequent clauses, which make exceptions from the comprehensive grant of the first article, or which qualify or restrict that grant. The subsequent clauses make provisions for the benefit of individuals, but they are benefits to be conferred by the United States, in consideration of the grant made to the United States by the tribe.

The engagements on the part of the United States, in the second article, to allow selections of sections by the ninety principal chiefs, and of half-sections by heads of families, and that twenty sections should be selected for orphan children, are not exceptions or reservations from the cession made by the first article of any pre-existing individual right in the chiefs, heads of families, or orphan children. This will be apparent from the historic fact, stated by the counsel, that the lands were the property of the tribe, and were not cut up into individual estates. The same thing is also clearly manifest from the language of the treaty, declaring that the lands were to be afterwards selected, and attempting no further specification than that the selections should conform to the lines of survey, and should include, when practicable, the improvements of the Indian selecting. The beneficiaries under the second article are not the grantors who make the conveyance effected by the first article. The treaty recognizes the title as passing from the tribe in its national capacity, and vesting in the United States; and the stipulations for the benefit of individuals are made by the

Rose v. Griffin.

United States, upon a consideration passing from the tribe. Individuals take the benefits provided for them from the United States.

The second and sixth clauses are declaratory of some of the trusts accompanying the transfer of the lands, which are by the treaty imposed upon the United States. The government, by virtue of the first article, takes the title to the lands, and then contracts to do certain things for the benefit of persons designated in the treaty.

As the individual Indians had no pre-existing title, which was reserved by the treaty, or excepted from it, and as the title by the first article vested in the United States, we must look to the stipulations and engagements made by the United States in the articles following the cession, to ascertain the individual rights growing out of the treaty. Whatever rights these Indians may have, result from those stipulations and engagements, and by them must be measured.

We proceed to inquire as to the legal effect of the stipulations in favor of heads of families, whose rights alone are to be considered in this case. The second article of the treaty, so far as it pertains to the point of inquiry, is in the following words: "The United States engage to survey the said land as soon as the same can conveniently be done after the ratification of this treaty; to allow ninety principal chiefs of the Creek tribe to select one section each, *and every other head of a Creek family to select one half-section each; and which tracts shall be reserved from sale, for their use, for the term of five years, unless sooner disposed of by them.* A census of these persons shall be taken under the direction of the president, and the selections shall be made so as to include the improvements of each person within his selection, if the same can be so made; and if not, then all the persons belonging to the same town entitled to selections, and who cannot make the same so as to include their improvements, shall take them in one body in proper form." The third article authorizes a conveyance of the tracts with the approval of the president, and directs that the president shall make title on the completion of payment. The fifth article

provides, that all intruders should be removed, until the country should be surveyed and the selections made; that after the selections should be made, the article should not operate upon that part of the country not included in the selections; *and that intruders should be removed from the selections for the term of five years from the ratification of the treaty*, or until the same should be conveyed to white persons.

After the Creek territory was surveyed, and the census of those entitled to make selections was taken, and the heads of families made the selections, they had some sort of title to the lands selected, upon which an action of ejectment might be sustained or resisted. The treaty does not, however, allow the estate vested by virtue of the treaty a longer duration than five years after its ratification. The estate results from the engagement to allow selections to be made, and that the tracts selected shall be reserved from sale for the use of the reservees for the term of five years. From such an origin a title to endure longer than five years cannot be derived. The government is simply to reserve from sale, for the use of the described persons, for five years from the ratification of the treaty. The restriction of the obligation to reserve from sale to the period of five years, suggests the conclusion, that a resumption of the authority to sell after the expiration of that period was contemplated. If that clause of the treaty stood alone, the United States, at the end of the prescribed period, might have sold the land, and, if charged with a breach of faith by the Indian, might have successfully replied, that it stipulated for nothing more than a reservation from sale for his use for five years, and had fulfilled that stipulation to the letter.

That the estate resulting from the selection by the head of a family was intended to be limited to five years, is also indicated in the limitation to five years of the obligation of the United States to protect the selected tract from intrusion. The need of protection to the Indians' possession was perceived, and it was provided for as long a time as it was anticipated that a need of it would exist.

The power of sale conferred by the third article was

not an unlimited power of disposition, but a power to sell for a fair consideration, with the approval of the president. The existence of such a power is not inconsistent with a limited duration of the estate expressly prescribed, and does not of itself amplify the estate into a fee.

The conclusion which we have expressed is fortified by the fact, that no patent was to be issued until the end of five years, and then only to those desirous of remaining. If the fee was vested by the selection, no conceivable reason or propriety can be found for the withholding of the usual evidence of title for five years from all the Indians, and perpetually from those not desirous of remaining. If, at the expiration of five years, the Indian who had voluntarily emigrated, and the Indian who desired to remain, alike had a title to the land, why discriminate between them, and give a patent to the latter and not to the former? It would seem, that those who had emigrated would most need a paper title to protect their rights, not accompanied with possession, and would be more likely to be the object of favorable discrimination, as the policy of the government evidenced by the treaty was to encourage emigration. This argument acquires increased force from the fact, that in the case of Benjamin Marshall, who, under the 6th article, clearly had a right to a complete title, a grant by patent is provided for, and not postponed for five years.

It being concluded that the selection by the head of a family gave a right which terminated at the end of five years, the inquiry now arises, what is the character of the right bestowed by the fourth article of the treaty. That article is as follows: "At the end of five years, all the Creeks entitled to these selections, and desirous of remaining, shall receive patents therefor in fee-simple from the United States." If the article had read, "At the end of five years, all the Creeks entitled to these selections, and desirous of remaining, shall be invested with a fee-simple title," it certainly would not have been less favorable to the Indian. The interpretation of that language would be: "When the five years have expired, an Indian entitled to the selection, *if he desires to remain,* shall take in

fee." Such words would certainly prescribe a condition precedent to the vesting of the estate.—Vaughan v. Vaughan, 30 Ala. 329; 1 Jarman on Wills, 671. Drawing our argument from a view of the treaty alone, we are led to the conclusion, that the right resulting from the selection terminated at the end of five years, and that then upon the occurrence of a prescribed condition precedent a right to a fee would spring up.

There are decisions of this court touching the question under examination, and we must consider their bearing upon it. The case of Chinnubbee v. Nicks, 3 Port. 362, presented the question of the right of dower, on the part of the widow of an Indian who had made his selection under the treaty, and died before the expiration of five years from its ratification. The right of dower, and the existence of a fee within five years in the reservee, were denied, and the Indian is said to have *an election to acquire a fee.* This stands irreconcilable with later decisions, which characterize the estate of the Indian as a fee defeasible upon condition subsequent. The opinion in Jones & Parsons v. Inge & Mardis, 5 Porter, 127, contains a careful approval of the ruling in Chinnubbee v. Nicks.

From the decision in Wells v. Thompson, 13 Ala. 793, we quote the following paragraph: "The title acquired by the head of a Creek family, under the treaty, *was to continue for five years,* unless it was sooner conveyed with the approval of the president; but, if there was no such conveyance, *it reverted to the United States,* unless the reservee or his heirs were desirous of remaining in the country after the expiration of that period. True, this is not explicitly declared; yet it follows from the terms employed in the fourth article, in which the United States stipulate to issue patents to all the reservees, who are desirous of remaining at the end of five years. *All the title of the Indian tribe passed from it, and the federal government became the proprietor of the fee in the territory they had previously occupied.* The government engaged, among other things, to allot half-sections of land to each head of a family, to be enjoyed *for five years absolutely,* and in fee *upon certain conditions. Here was the grant of a fee-*

*simple estate, defeasible on the happening, or rather not happen-
ing, of the event specified. If the condition was not performed
as provided,* the title of the reservee determined, and the
land revested in the United States, without any entry or
other act on the part of its agents." In the case from
which this quotation is made, it was not necessary to con-
sider the question, whether the fee which might vest in
the reservee after five years was a new estate, springing
up on the performance of a condition, or the continuance
of a pre-existing estate, not defeated at the end of five
years, because the condition of its defeasance had not
occurred. Hence some incongruity of expression has
crept into it. The title which the Indian took by his
selection, is spoken of as one "to continue for five years,"
and yet as reverting at the end of five years to the United
States; as one to be enjoyed for five years absolutely, and
in fee upon certain conditions, and yet as being a fee de-
feasible upon a condition subsequent. The conclusion
that the estate which the reservee took was a fee, defeas-
ible upon his not desiring to remain, is a *non sequitur* from
that which precedes it. It is clearly a doctrine of the
opinion from which we quote, that the title taken in the
first place continued for only five years. If the estate was
a fee defeasible at the end of five years, upon the not
happening of a specified event, then the estate of the
reservee who remained upon the land, and received a
patent for the same, was the same in character after five
years expired as before. If the Indian took a fee, merely
continued on in existence if at the end of five years he
desired to remain, then the estate after five years is a mere
continuation of the same estate which existed before, and
the two are but parts of the same fee; yet we know such
is not the case. The estate before the expiration of five
years is altogether different in its *quality* from that which
existed after five years, if there was a desire to remain.
Many of the incidents of a fee were carefully and expressly
excluded from the title of the reservee before the end of
five years. He could alien only by sale, and by sale only
upon payment made, and in the manner directed by the
president, and with the president's approval. Upon the

47

occurrence of the specified condition after five years, the Indian was to receive a patent, the evidence of a complete and unqualified fee, by virtue of which he would hold the land without any of the qualifications 'or incidents which attached to his previous title.

While the argument in Wells v. Thompson seems to sustain the position taken by us, its conclusion treats the two distinct and distinguishable estates existing before the expiration of five years and afterwards, if there was a desire to remain, as parts of the same fee.

The language used in Corprew v. Arthur, 15 Ala. 525, a case like the above, requiring no consideration of the precise point now in hand, is almost identical with that above quoted, and we decline to follow either of them in the conclusion announced.

In Rowland & Heifner v. Ladiga, 21 Ala. 9, it is treated as an established fact in the case, that Ladiga remained on the land, and was forcibly carried away from it after the five years; and the question was, what was a sufficient manifestation of her desire to remain on the land, and what would be the rights of her heirs, if the condition was complied with. The question of this case really did not arise before the appellate court in that case. It was immaterial in that case, as in Wells v. Thompson, and Corprew v. Arthur, whether the Indian was regarded as taking by the selection a fee defeasible upon condition subsequent, or as taking after the expiration of five years upon a condition precedent. In either view of the law, the rights of the parties were the same. And no argument is adduced upon the question. A departure from the conclusion expressed in those cases, as to a defeasible fee, involves a disturbance of no rights, and is, in our opinion, demanded by a just construction of the treaty, by a respect for our older decisions, and by the interests alike of the government, of the purchasers of the lands, and of the Indians, who receive the purchase-money under the act of congress, a thing of much more value to them than the land.

Whatever claim the Indian reservee may have had upon the generosity or justice of the government, he had no

claim to the land after the expiration of five years from the ratification of the treaty, unless he desired to remain. That he desired to remain, cannot be assumed. A party desiring to set up an outstanding title in the Indian reservee must show affirmatively the condition precedent upon which that title depended. The court below erred, therefore, in assuming that the reservee had a paramount title to the land, and that therefore the patent was void.

Whether the defendants are in a condition to set up the title of the reservee, and whether the patent can be controverted by any other than the reservee, and whether the decision of the government as to the performance of the condition precedent is not conclusive, are questions which we deem it unnecessary to consider in the case as now presented.—Jones & Parsons v. Inge & Mardis, *supra.*

The judgment of the court below is reversed, and the cause remanded.